McGARRY et al., Appellants,

v.

HORLACHER, M.D., et al., Appellees.

[Cite as *McGarry v. Horlacher*, 149 Ohio App.3d 33, 2002-Ohio-3161.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18901.

Decided June 21, 2002.

Dwight D. Brannon, for appellants.

Susan Blasik–Miller and Lisa A. Hesse, for appellees.

WOLFF, Presiding Judge.

{¶ 1} Lynn McGarry, her husband, Edward, and their two children (hereinafter collectively referred to as "McGarry") appeal from a judgment of the Montgomery County Court of Common Pleas in favor of Dr. James B. Horlacher. The trial court directed a verdict or granted summary judgment on some of McGarry's claims, and a jury found in favor of Horlacher on the remaining claims.

{¶ 2} The facts and procedural history of the case are as follows. McGarry gave birth to her second child on August 15, 1997, by Cesarean section. Horlacher was her obstetrician/gynecologist and performed the Cesarean section. McGarry had a routine follow-up appointment with Horlacher several weeks later.

{¶ 3} In November 1998, when McGarry went to Horlacher's office for an annual exam, Horlacher's nurse midwife was unable to perform a routine Pap smear because of a large mass in McGarry's abdomen. Horlacher suspected that the mass was a fibroid. Fibroids are growths in or around the uterus that are generally harmless but that may be surgically removed if they cause discomfort or unusual bleeding. Horlacher performed an ultrasound in his office and sent McGarry for a more specialized ultrasound at another location to attempt to exclude the possibility that the mass was on McGarry's ovaries. The ultrasounds were consistent with a large fibroid of the uterus.

{¶ 4} Horlacher informed McGarry of various treatment options. One option was to do nothing because McGarry was not suffering any ill effects from the mass. Another was to attempt a myomectomy, which is the removal of the

fibroid. With a myomectomy, however, the patient runs the risk of a hysterectomy, especially with a large fibroid. A hysterectomy was another option. Because McGarry was only thirty-one years old and was interested in having more children, she elected to have a myomectomy. Before the myomectomy was performed, McGarry was given monthly injections of Lupron for three months in an effort to shrink the size of the fibroid and ease its surgical removal. The mass did not shrink during the course of the Lupron injections; in fact, it continued to grow.

{¶ 5} Because Horlacher believed that a myomectomy would probably lead to a hysterectomy, he recommended that McGarry try a relatively new procedure called embolization before opting for surgery on the uterus. A radiologist performed the embolization procedure on McGarry on April 16, 1999. The embolization was unsuccessful, and it also revealed that the abdominal mass was pressing on McGarry's ureters and could ultimately cause kidney damage. After learning about the possible kidney damage, McGarry decided to have a hysterectomy.

{¶ 6} Horlacher performed the hysterectomy on April 18, 1999. When Horlacher opened McGarry's abdomen, he noticed that the suspected fibroid had undergone a lot of degeneration, and he thought that it might have been some type of tumor. A pathology test confirmed that the mass was leiomyosarcoma, not a fibroid. Leiomyosarcoma is a very aggressive cancer that is extremely rare in premenopausal women. It is unusual for a woman to survive leiomyosarcoma, even if it is discovered in its early stages. Horlacher determined that McGarry's leiomyosarcoma was in Stage III at the time of surgery, which meant that it had advanced beyond the uterus and cervix.

{¶ 7} On October 1, 1999, McGarry filed a medical malpractice claim and other claims against Horlacher. She claimed that Horlacher had deviated from the standard of care by failing to diagnose and properly treat her leiomyosarcoma and had failed to inform her of the risk that the mass could be cancer in presenting the various treatment options. She later amended her complaint to allege medical malpractice, infliction of emotional distress, loss of chance of survival, fear of impending death, diminished life expectancy, and loss of consortium. The trial court granted summary judgment in favor of Horlacher on the claims for fear of impending death, diminished life expectancy, and infliction of emotional distress.

{¶ 8} At trial, the parties presented conflicting evidence about the appropriate treatment of a large suspected fibroid. McGarry's expert, Dr. James W. Orr, testified that Horlacher should have used much more aggressive means of diagnosing the mass and, specifically, of excluding the possibility of cancer. Orr also opined that the mass had probably been present in McGarry's abdomen at

the time of her Cesarean in 1997 and that its rapid growth since the time of the Cesarean had been cause for alarm. Horlacher and his expert witnesses, Dr. William A. Nahhas and Dr. William M. Jamieson, testified that Horlacher's initial belief that the mass had been a fibroid had been very reasonable under the circumstances, that his use of treatment methods associated with fibroids had been within the standard of care, that leiomyosarcoma is almost always diagnosed surgically when operating on a suspected fibroid, as it was in this case, and that leiomyosarcoma is exceedingly rare in a woman of McGarry's age. Horlacher, Nahhas, and Jamieson also testified that, while rapid growth had been considered a significant factor in the removal of fibroids in the past, recent literature had discounted the relationship between rapid growth and malignancy. The experts agreed that leiomyosarcoma is an extremely aggressive disease and that the chances of survival are poor even if it is caught early.

{¶ 9} On the issue of informed consent, McGarry and her husband testified that Horlacher had not informed them of the possibility of cancer in their discussions about how to proceed with treatment of the fibroid. They testified that they had been very concerned about the possibility of cancer and had been vigilant about getting routine screening for cancer because several members of their families had suffered from the disease. They also stated that had they known that cancer was a possibility, they would have proceeded differently in their treatment of the mass. Horlacher, on the other hand, testified that he had mentioned the possibility of cancer to the McGarrys, but that the odds of leiomyosarcoma had been so remote that he had not felt it was appropriate to emphasize that risk.

{¶ 10} At the close of McGarry's case, Horlacher moved for a directed verdict on McGarry's direct malpractice claim, arguing that there had been no evidence that he had caused McGarry's cancer or that her chances of surviving this particular form of cancer had ever been greater than fifty percent. The trial court granted this motion. The issues of informed consent and negligent treatment went to the jury. By special interrogatory, the jury found that Horlacher had not been negligent in diagnosing or treating McGarry and that he had not failed to inform her of the material risks in her treatment.

{¶ 11} McGarry raises six assignments of error on appeal. We will address these assignments in the order that facilitates our discussion.

{¶ 12} "II. The selection and impaneling of the trial jury was prejudicially erroneous as a matter of law."

{¶ 13} Under this assignment of error, McGarry argues that the trial court erred in refusing to excuse Sally Lindsay and Sandra Bantz from the venire for cause because they had indicated that they "could not be fair in the trial of Dr. Horlacher."

{¶ 14}   The determination whether a prospective juror should be disqualified for cause is a discretionary function of the trial court.  *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus.  Such a determination will not be reversed on appeal absent an abuse of discretion.  Id.  The term " 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary, or unconscionable."  Id. at 169, 559 N.E.2d 1301.  The erroneous denial of a challenge for cause may be prejudicial because it forces a party to use a peremptory challenge on a prospective juror who should have been excused for cause, giving that party fewer peremptories than the law provides.  See *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646.

{¶ 15}   McGarry claims that Bantz "indicated that [she] could not be fair in the trial of Dr. Horlacher."  We find no such statement in the record, nor have we found any discussion from which bias could be inferred.  Moreover, the record does not demonstrate that McGarry moved to excuse Bantz for cause.  Thus, we reject the argument that the trial court should have excused Bantz for cause.

{¶ 16}   Lindsay, on the other hand, was a current patient of Dr. Horlacher at the time of trial and had been treated by him for approximately eight years.  In fact, he had previously performed a hysterectomy on her because of a "possible tumor" in her "stomach area."  The tumor had been benign, and Lindsay could not remember whether the tumor had originally been diagnosed as a fibroid.  Although Lindsay expressed her view that it "might be best" for her to sit on a different jury and that it "probably would be difficult" for her to sit in judgment of Horlacher's conduct, the trial court concluded that Lindsay's problems with sitting on the jury had "to be a tad more concrete than that" to justify her removal for cause.  The trial judge then had the following exchange with Lindsay:

{¶ 17}   "COURT: * * * So, the question that each juror must decide for themselves is whether or not they * * * can be a fair and impartial juror in the case.  If your answer is yes, then we will move on.  If it is no, then you will have to be excused, and we will proceed with another juror.

{¶ 18}   "LINDSAY: I believe I could be fair and impartial.  I do have a good relationship with Dr. Horlacher, and, you know, I would hope that would not enter my decision, but—

{¶ 19}   "COURT: That sounds like a yes to me.

{¶ 20}   "LINDSAY: Yes."

{¶ 21}   Ultimately, the trial court refused to excuse Lindsay for cause, and McGarry used a peremptory challenge to remove her from the jury.

{¶ 22} The record suggests that McGarry objected to the trial court's refusal to excuse Lindsay for cause, but not all of the discussions about this matter were on the record. However, because Horlacher implicitly admits in his brief that McGarry challenged Lindsay for cause, we will presume that this matter was properly raised at trial.

{¶ 23} In our view, the trial court abused its discretion in refusing to excuse Lindsay for cause, notwithstanding her somewhat qualified statements that she believed she could be fair and impartial. We are unpersuaded that Lindsay could have totally put aside her own physician-patient relationship with Horlacher in assessing McGarry's case, especially in light of the fact that Horlacher had treated her for an abdominal mass. Moreover, it is axiomatic that McGarry was entitled to jurors who were free from personal relationships with Horlacher, and we are somewhat baffled by the trial court's determination not to excuse Lindsay for cause in light of the information presented during voir dire about her relationship with Horlacher.

{¶ 24} The trial court's refusal to excuse Lindsay for cause forced McGarry to use one of her peremptory challenges to remove Lindsay from the venire. This was prejudicial to McGarry because it forced her to use a peremptory challenge on a prospective juror who should have been excused for cause, giving her fewer peremptory challenges than Civ.R. 47(B) provides and fewer than Horlacher was given. See *State v. Cornwell* (1999), 86 Ohio St.3d 560, 715 N.E.2d 1144; *Williams,* 79 Ohio St.3d at 8, 679 N.E.2d 646; *State v. Tyler* (1990), 50 Ohio St.3d 24, 30–31, 553 N.E.2d 576. We note that McGarry did use all three of her peremptory challenges and thus cannot be said to have waived her objection to having Lindsay on the jury. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 191, 702 N.E.2d 866 (holding that error in the denial of a challenge for cause cannot be grounds for reversal when the defendant did not exhaust his peremptory challenges). See, also, *State v. Roe* (1989), 41 Ohio St.3d 18, 21, 535 N.E.2d 1351; *Jacobs,* infra. Thus, the trial court erred to McGarry's prejudice in refusing to excuse Lindsay for cause.[1]

{¶ 25} The cases relied upon by Horlacher are distinguishable. In *Williams v. O'Brien* (Nov. 25, 1992), Montgomery App. No. 12344, 1992 WL 348218, the prospective juror had been a patient of one of the expert witnesses, but not of the defendant himself. In *Jacobs v. Robinson Mem. Hosp.* (Sept. 14, 1993), Portage

---

1. Although the Supreme Court of Ohio has repeatedly commented upon the unfairness of requiring a party to use a peremptory challenge on a prospective juror who should have been excused for cause, we note that the United States Supreme Court has rejected the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. *Ross v. Oklahoma* (1988), 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80.

App. No. 92–P–0094, 1993 WL 346394, prospective jurors had been patients of a defendant doctor eleven and fifteen years earlier but were not his patients at the time of trial.

{¶ 26} McGarry also argues that Horlacher "deliberately and discriminatorily excluded three women in favor of three men" during jury selection and that the law prohibits the use of peremptory challenges based solely on gender. Horlacher argues that the Supreme Court's holding that the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender applies only to state actors and not to private litigants.

{¶ 27} In *Edmonson v. Leesville Concrete Co., Inc.* (1991), 500 U.S. 614, 624, 111 S.Ct. 2077, 114 L.Ed.2d 660, the Supreme Court held that a jury "is a quintessential governmental body, having no attributes of a private actor" and that the delegation of some of the responsibility for selecting a representative and impartial jury to private litigants through the use of peremptory challenges in a civil case does not change the fact that it is a governmental function.

{¶ 28} "Though the motive of a peremptory challenge may be to protect a private interest, the objective of jury selection proceedings is to determine representation on a governmental body. * * * The fact that the government delegates some portion of this power to private litigants does not change the governmental character of the power exercised." Id., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660.

{¶ 29} Thus, the Supreme Court concluded that the Equal Protection Clause prohibits the use of peremptory challenges in a discriminatory manner in civil cases as well as in criminal cases. As such, we reject Horlacher's argument that the Equal Protection Clause does not limit the exercise of peremptory challenges by private civil litigants.

{¶ 30} We note, however, that the party objecting to the use of peremptory challenges is required to raise such an objection in the trial court by making a prima facie showing that the opposing party has exercised peremptory challenges on an improper basis such as race or gender. If the requisite showing is made, the burden shifts to the opposing party to articulate a race- or gender-neutral explanation for striking the jurors in question, after which the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. See *Batson v. Kentucky* (1986), 476 U.S. 79, 93–94, 106 S.Ct. 1712, 90 L.Ed.2d 69. In this case, McGarry did not challenge Horlacher's use of peremptory challenges at trial. Thus, Horlacher did not have the opportunity to articulate his reasons for striking three female jurors, and the trial judge could not resolve whether his explanation should be believed. In the absence of a timely objection to the use of peremptory challenges in the trial

court, where the issue could have been developed more fully, we will not speculate on appeal about the motivation for these peremptory challenges.

{¶ 31} Finally, McGarry objects to the fact that "the jury was comprised of two women, both much older than Lynn McGarry, and six men, one of whom was single, and at least three others were older men than appellants, who certainly did not understand and did not wish to hear anything concerning female gynecological problems." In response, we note that *Batson* does not create a right to a jury of any particular composition. *State v. Holloway* (1998), 129 Ohio App.3d 790, 796, 719 N.E.2d 70. McGarry's argument implies that the trial court should have somehow shown preference for jurors who were married, female, around the same age as McGarry, or who had a certain level of interest in gynecological issues. There is no support in the law for such an argument, and we certainly will not presume that only those who were demographically similar to Lynn McGarry or had a particular interest in gynecological issues could objectively assess whether Horlacher had acted negligently. The second assignment of error is sustained in part and overruled in part.

{¶ 32} Based on our disposition of the second assignment of error, which will necessitate a new trial, we will address the remaining assignments of error only to the extent that our discussion may be helpful to the trial court on remand or where the assignment relates to a judgment entered in favor of Horlacher.

{¶ 33} "I. The court did not charge the jury pursuant to the requirements of Civ.R. 49 and R.C. 2315.01. The trial court committed prejudicial error by submitting to the jury erroneous jury instruction and inconsistent, untimely interrogatories and verdict forms."

{¶ 34} McGarry claims that the jury instructions and the interrogatories that were submitted to the jury unfairly prejudiced or confused the jury.

{¶ 35} McGarry contends that a general verdict "was all that was necessary" and that the interrogatories "served no valued purpose except to confuse the jury." We disagree. The interrogatories were properly addressed to determinative issues in the case and were very straightforward. The trial court did not err in submitting these interrogatories to the jury. See *Martin v. St. Vincent Med. Ctr.* (2001), 142 Ohio App.3d 347, 362–363, 755 N.E.2d 926.

{¶ 36} McGarry also objects to the jury instructions on different and customary methods of treatment, bad results, and possible causes. Our review of the record reveals, however, that the bad-result and possible-causes instructions to which McGarry objects were, in fact, never given. Obviously, then, this objection is without merit. The different and customary-methods instruction that was given was identical to that contained in 3 Ohio Jury Instructions (2002), Sections § 331.03(3) and (4). McGarry argues that this instruction was erroneous because

all of the experts agreed that the proper treatment for leiomyosarcoma was surgical removal. This argument is disingenuous and mischaracterizes the issue that was before the jury. The different and customary methods instruction bore on Horlacher's treatment of McGarry's symptoms as they initially presented themselves and unfolded, not as ultimately diagnosed. Conflicting evidence was presented about how Horlacher should have proceeded when he first realized that there was a mass in McGarry's abdomen.

{¶ 37} McGarry refers to numerous other instructions without presenting a specific argument as to why the trial court's failure to give these instructions was egregious. Because they are not specifically argued, we will not consider these issues.

{¶ 38} The first assignment of error is overruled.

{¶ 39} "III. The trial court committed prejudicial errors and denied the appellants a fair trial by its erroneous rulings before, during, and after trial."

{¶ 40} Under this assignment of error, McGarry claims that the trial court made numerous erroneous rulings at trial. We will address these rulings briefly to the extent that our discussion might be helpful to the trial court and the parties on remand.

{¶ 41} McGarry contends that she should have been allowed to introduce Horlacher's testimony from another medical malpractice case, in which Horlacher was a defendant and in which both Horlacher and his expert witness, Nahhas, had testified as experts. McGarry relies on *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 743 N.E.2d 890, in support of her argument.

{¶ 42} In *Oberlin,* the Supreme Court held that "evidence that an expert witness is a defendant in a pending malpractice action alleging a medical error similar to the one at issue is probative and is admissible to prove bias, prejudice, or motive to misrepresent." Id. at 171, 743 N.E.2d 890. In that case, the facts of the case in which the doctor was testifying as an expert were very similar to the facts in a pending malpractice case against the expert doctor. No previous medical malpractice claims against the defendant doctor were at issue. The court noted that the fact that the evidence presented "no * * * danger of an evidentiary ricochet," i.e., it revealed information relevant to the expert but not to the defendant, weighed in favor of its admission. Id. at 172, 743 N.E.2d 890. The court concluded that such evidence, although prejudicial, was not unfairly prejudicial. The court did comment, however, that attempts to inflame jurors by describing the "horrors" of another plaintiff's injuries might be considered unfairly prejudicial. Furthermore, while we recognize that a doctor often testifies as an expert in a medical malpractice suit against him, *Oberlin* did not specifically address whether a defendant doctor's own statements in another

medical malpractice case could be used against him. Obviously, the fact that a defendant doctor has been involved in other medical malpractice cases has a greater risk of being unfairly prejudicial than such evidence related to an expert witness.

{¶ 43} The trial court ruled that Drs. Horlacher and Nahhas could be cross-examined about opinions that they had offered about the standard of care in the other case, but that the existence of a prior medical malpractice case against Horlacher, the facts of that case, and its result were not admissible. In our view, this ruling was wholly in keeping with the views expressed in *Oberlin*. McGarry's attorney, however, did not keep his questions within these parameters. He attempted to elicit testimony that Horlacher had previously misdiagnosed ovarian cancer as a fibroid. The trial court properly forbade this type of questioning, and *Oberlin* does not support its admission.

{¶ 44} McGarry also argues that she should have been permitted to introduce evidence regarding Horlacher's personal state of affairs at and around the time that he treated her. Discovery revealed that Horlacher had had an affair with a surgical assistant, Kristen Blust, who had become pregnant, that Horlacher's wife had subsequently made some type of threats against Blust or her husband that resulted in criminal charges being brought against Mrs. Horlacher, and that Blust had filed a paternity action against Horlacher. McGarry contends that these personal matters affected Horlacher's "ability to make a critical diagnosis, observe [McGarry's] signs and symptoms, or advise [McGarry] of the differential diagnosis of cancer, or perform a hysterectomy." In our view, however, such evidence would have invited the jury to judge Horlacher on his character rather than on his performance as a physician in contravention of Evid.R. 402 and Evid.R. 403(A). The trial court correctly determined that the evidence in question was "highly prejudicial," that admitting the evidence would "allow the jury to speculate on inferences," and that the relevance of such evidence was substantially outweighed by its prejudicial effect.

{¶ 45} Next, McGarry contends that Nahhas should not have been permitted to testify as an expert because he was one of McGarry's treating physicians and the physician-patient privilege applied. We rejected this argument in *Humble v. Dobson* (Nov. 1, 1996), Champaign App. No. 95–CA–12, 1996 WL 629535, wherein we held that a plaintiff waives the physician-patient privilege with regard to all matters causally and historically related to an injury by filing a medical malpractice claim. We decline McGarry's invitation to reconsider our decision in *Dobson*.

{¶ 46} In her opening statement, Horlacher's attorney made reference to Dr. Gregory Sutton as a witness who would be called at trial, but she later decided not to call him because she felt that his testimony would be cumulative and might bore the jury. In response to this turn of events, McGarry sought to read three

separate sections of Sutton's deposition into the record and ultimately sought to have the entire deposition admitted. The first section was a statement by Sutton that he did not find any fault with James Orr, McGarry's expert, and that Orr was a "great guy." The second section consisted of McGarry's counsel's effort to pin Sutton down about whether the tumor had been present at the time of McGarry's Cesarean in August 1997. It appears that counsel was trying to establish whether, based on the progression of the disease, it was probable that the tumor had been on McGarry's uterine wall at the time of the Cesarean. Sutton stated that the staging and growth of the disease could not be used retrospectively to determine how far the disease had progressed at a certain point in the past. In the third section, Sutton stated his understanding of the meanings of various mitotic counts in relation to malignancy.

{¶ 47}  The trial court excluded Sutton's deposition testimony related to Dr. Orr on the ground that it would confuse the jury. Read in context, it is clear that Sutton did not state an opinion regarding Orr's success in treating patients or approve of Orr's opinion regarding Horlacher's treatment of McGarry. The trial court could have reasonably concluded that McGarry's selective use of Sutton's testimony that Orr was a "great guy" did not accurately reflect the substance of Sutton's testimony about Orr's medical opinions and would not have been helpful to the jury. Moreover, this comment was irrelevant to the issues in the case. The trial court properly excluded this portion of Sutton's testimony.

{¶ 48}  The testimony regarding the probability that the tumor had been present in McGarry's abdomen at the time of her Cesarean was excluded because it did "not sufficiently meet the required tests of probability for rendering medical opinions." The whole point of the exchange cited by McGarry's attorney was to establish that Sutton would *not* testify at trial that the tumor had *probably* been present at the time of the Cesarean. In other words, Sutton believed that it was possible, but not probable, that the tumor had been present in August 1997. The trial court did not abuse its discretion in determining that expert medical testimony about possibilities was inappropriate.

{¶ 49}  Sutton's deposition testimony regarding the meaning of various mitotic counts was undisputed and was excluded because it was already in evidence through the testimony of McGarry's expert. The trial court ruled that this testimony was cumulative and was not proper rebuttal evidence because it did not rebut anything offered in the defense's case. The trial court did not abuse its discretion.

{¶ 50}  More generally, McGarry's brief suggests that Sutton's testimony "buttressed" Orr's testimony that the cancer was present and could have been diagnosed in August 1997 when McGarry had her Cesarean. This assertion mischaracterizes the evidence. Orr testified that the adhesions noted in Horlach-

er's surgical notes from the Cesarean probably represented the onset of the leiomyosarcoma and would have been in view during the surgery. Sutton refused to state to a medical probability that the leiomyosarcoma had been present at the time of the Cesarean and stated that, even if it had been present, the malignancy appeared from the ultrasounds to have originated in the "posterior uterus [which] isn't very well visualized at all at the time of Cesarean section." Thus, Sutton's testimony cannot reasonably be construed to have "buttressed" Orr's testimony.

{¶ 51} We also note that it was McGarry, not Horlacher, who attempted to introduce Sutton's opinions without having him present as a witness. Horlacher's references in opening statement to calling Sutton as a witness were vague and innocuous. McGarry, however, tried to inject some of the specifics of Sutton's anticipated testimony during her direct examination of Orr because Orr was leaving the state immediately after his own testimony and would have been unavailable to rebut Sutton's testimony later in the trial. McGarry's roundabout method of commenting on Sutton's opinions may have complicated her case when Horlacher decided that Sutton's testimony was unnecessary, but Horlacher was certainly under no obligation to call Sutton. Had McGarry waited to rebut Sutton's testimony until after it had been offered, in the usual order of things and as she was entitled to do, she would have avoided the difficulties created by her repeated references to Sutton's testimony before it had been offered.

{¶ 52} McGarry further claims that the trial court erred in granting summary judgment "based upon missing evidence and/or spoilation [sic]." Our review of the record reveals that the trial court granted partial summary judgment on McGarry's claims for fear of impending death, diminished life expectancy, and infliction of emotional distress. McGarry somehow relates these rulings to spoliation of evidence regarding the stage of her leiomyosarcoma at times prior to April 1999. In other words, McGarry claims that Horlacher spoiled evidence regarding the progression of her disease by failing to diagnose it sooner. It is unclear to us how the alleged spoliation relates to the trial court's ruling on the motion for partial summary judgment. As such, we will briefly address the propriety of the summary judgment based on how the matter was presented in the trial court.

{¶ 53} The trial court correctly concluded that causes of action for fear of impending death and diminished life expectancy do not exist in Ohio. Evidence on these issues is properly presented in relation to damages in a cause of action for malpractice, but not as an independent cause of action. The court concluded that a cause of action for negligent infliction of emotional distress did not lie under the facts of this case because McGarry's life had not been put in peril by an external force nor had she witnessed an accident or event putting the life of a close friend or loved one in peril, the only situations in which the

Supreme Court has recognized such a cause of action. See, generally, *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 652 N.E.2d 664. The court further pointed out that, even if cancer could be characterized as an external force, Horlacher had not caused the cancer, and that treating the alleged misdiagnosis of the cancer as an external force was an untenable stretch of the definition of negligent infliction of emotional distress. Finally, the trial court noted that McGarry had not pled any facts that would support a claim for intentional infliction of emotional distress. We agree with all of these conclusions.

{¶ 54}  McGarry also contends that the trial court erred in directing a verdict on her "survivability claim" or what the defense refers to as the "direct medical malpractice claim." This argument relates to whether McGarry's chance of survival had been greater than fifty percent at any stage in her treatment by Horlacher. Horlacher presented evidence that leiomyosarcoma is an extremely aggressive disease and that, even if diagnosed in Stage I, the earliest stage of malignancy, the chances of surviving the disease are less than fifty percent. McGarry claims that some evidence was presented from which the jury could have concluded that she would have had a greater-than-fifty-percent chance of survival if the leiomyosarcoma had been caught in its early stages. McGarry's expert, Dr. Orr, testified that Lynn would not survive her sarcoma and that failure to diagnose the disease earlier reduced the likelihood of success of treatment. He also testified that, even when diagnosed in Stage I, women with leiomyosarcoma have "as high as a 50 percent recurrence." McGarry relied on Horlacher's own testimony in opposing the motion for directed verdict.

{¶ 55}  Initially, on cross-examination, Horlacher was asked whether McGarry had been "more likely to live than not" if the leiomyosarcoma had been diagnosed and removed in 1997. Horlacher responded that McGarry had not had leiomyosarcoma in August 1997. He then testified:

{¶ 56}  "Q: * * * [Y]ou would agree [that] if she had been diagnosed and operated on in 1997, she more likely would be able to live a normal life expectancy than not?

{¶ 57}  "A: I would agree with that.

{¶ 58}  "Q: Doctor, in regard to the care and treatment of her, the sooner you get this, you catch a leiomyosarcoma and start treating it, the greater chance then of survival, a longer time, would you agree with that?

{¶ 59}  "A: That is not – with this tumor, with this kind of malignancy, that is not so easy to say as it is with others because it is so aggressive. If it is found when it is even confined to the uterus, chances are still only 50 percent that your patient will survive five years. * * *"

{¶ 60} When Horlacher moved for a directed verdict at the close of McGarry's case, the trial court found that McGarry had presented no evidence that "the chance of survival was anything greater than 50 percent at any stage of the treatment." McGarry took issue with this conclusion, claiming that "[t]he fair reading" of Horlacher's testimony was that "she would have lived had she been operated on during 1997 for sure. More than 50/50." However, at the time of this dispute, Horlacher's testimony had not been transcribed, and the court and the parties had to rely on their recollections of the testimony, which were not consistent. During Horlacher's direct examination, his attorney followed up on this issue, asking whether he was of the opinion that McGarry would "more likely have lived than not" if the leiomyosarcoma had been diagnosed and removed in 1997. At that point, Horlacher clarified that, even if the leiomyosarcoma had been in Stage I at that time, it was his opinion that McGarry would not have been more likely to live than not.

{¶ 61} McGarry now argues that Horlacher's original answer made a directed verdict inappropriate and that it was improper for Horlacher to be asked the question a second time, giving him the opportunity "to attempt to change his testimony as best as he could." We disagree. First of all, *read in context,* the substance of Horlacher's original testimony did not support McGarry's premise that she would have had a greater-than-fifty-percent chance of survival if she had been diagnosed in 1997. The trial court was not required to base its directed verdict ruling on one answer, which was apparently a misstatement or a misunderstanding of the question when, on the whole, it was clear that Horlacher had not believed that McGarry had had a greater than fifty percent chance of survival at any point. Finally, we reject McGarry's suggestion that the jury was incapable of understanding the loss of chance instruction without juxtaposing it with a survivability instruction.

{¶ 62} McGarry's claim that she was prejudiced by the trial court's desire to rush through the proceedings is not supported by the record. The remaining issues raised under this assignment of error have been addressed elsewhere in this opinion or have not been raised in conformity with App.R. 16(A)(7).

{¶ 63} The third assignment of error is overruled.

{¶ 64} "IV. The conduct of appellee at trial created prejudicial error and denied appellants a fair trial."

{¶ 65} The crux of McGarry's argument under this assignment of error is that she was "ambushed" at trial because the defense "advanced the testimony" that McGarry's tumor had been present at the time of her Cesarean, but then failed to present evidence in support of that contention. McGarry also claims that it was error for Horlacher's attorney to refer to a picture of a fibroid in her opening statement but not to admit that picture into evidence.

{¶ 66} McGarry's argument regarding ambush turns the actual testimony on its head. No reasonable interpretation of the evidence presented could lead one to conclude that Horlacher was advancing the theory that the leiomyosarcoma had been present at the time of McGarry's Cesarean. It would make no sense for him to do so as such evidence would probably make the jury more likely, not less likely, to find negligence. Moreover, Horlacher's references to Dr. Sutton in opening statement in no way suggested that he would offer testimony about the presence of a tumor at the time of the Cesarean. Rather, Dr. Orr, the McGarrys' expert, propounded this theory.

{¶ 67} McGarry also objects to Horlacher's demonstrative use of a picture of a fibroid at trial without admitting it into evidence. The record refutes McGarry's claim that she objected to this exhibit, and thus she has waived the alleged error. Furthermore, the picture was relevant to the jury's understanding of the issues presented, and McGarry has failed to advance a coherent argument about how she was prejudiced by the use of or failure to admit this exhibit. It was undisputed that the picture was from a "manual that literally every gynecologist * * * has in his office," so we will presume that the picture represented what it purported to represent.

{¶ 68} The fourth assignment of error is overruled.

{¶ 69} "V. The trial court erred by not permitting the testimony of Dr. John Burke, an economist, on the loss of enjoyment, hedonic, and other related economic damages."

{¶ 70} McGarry argues that the trial court erred in excluding the testimony of Dr. John Burke regarding how to assess the "different, unique, and difficult elements" of hedonic damages that she had suffered. In response, Horlacher argues that this issue is moot because the jury found no liability. In light of the fact that we are remanding this case for a new trial, however, we think it would be wise for us to address the propriety of the trial court's ruling. We note that Burke was allowed to testify about McGarry's lost earning capacity and the value of her services as a homemaker.

{¶ 71} Burke attempted to assign a monetary value to a random American woman's qualitative enjoyment of life at McGarry's age. He admitted that, because his calculations were based on a random American, his method would assign the same hedonic damages to a woman who had been sentenced to spend life in prison as to a woman living a normal, healthy life with her family. Burke readily admitted that his views were controversial in his field, that they were "on the frontier of knowledge," and that the application of his methodology to hedonic damages was subject to substantial disagreement within the scientific community. After hearing the proffered testimony, the trial court stated:

{¶ 72} "The Court's obligation, obviously, under [Evid.R.] 104 and the *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469] case and its progeny are to make a review of the scientific bases for the admissibility of the evidence in question, and the court has done that in this case.

{¶ 73} "*Daubert* suggests that there are some key questions for the Court to resolve to make a determination of admissibility issues. That is, whether the reasoning or methodology employed by the expert has been tested, whether the theory or technique has been subject to peer review and publication, consideration of potential rates of error in existence, and maintenance of standard controlling the techniques or operation, and whether the methods and techniques have gained general acceptance within that particular scientific community.

{¶ 74} "* * *

{¶ 75} "The Court is also mindful of the definition of hedonic damages. That is, the inability to perform activities which had given pleasure to this particular plaintiff, which are distinguished from basic losses, which are, disabilities that include the basic mechanical body functions of walking, climbing, feeding oneself and so on. Because that distinction is made in Ohio law and is not made in the calculations or considerations of the expert plus the infirmities that these particular calculations apparently are subject to in the scientific community, the Court feels that it is better advised to sustain the motion and not allow the expert to testify on the hedonic damages issue in this regard.

{¶ 76} "Now, I am aware that * * * under *Daubert* there are areas of science that are shaky but admissible that can be introduced, but I just don't think this is in the shaky but admissible category * * *. It may attain that with more study in the near future, but I just don't believe it is there now."

{¶ 77} From the trial court's discussion of Burke's testimony, it is clear that the court considered the proper criteria in evaluating Burke's testimony regarding hedonic damages. The trial court did not abuse its discretion in reaching the conclusion that it did.

{¶ 78} The fifth assignment of error is overruled.

{¶ 79} "VI. The verdict was against the weight of the evidence, the manifest weight of the evidence [sic] as well as, physical facts, scientific knowledge, and was a manifest miscarriage of justice."

{¶ 80} McGarry argues that the jury's verdict was against the manifest weight of the evidence. We disagree. However, because we are remanding for a new trial, we need not fully address this argument.

{¶ 81} The sixth assignment of error is overruled.

{¶ 82}  The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for a new trial.

Judgment affirmed in part,
reversed in part
and cause remanded.

BROGAN and FAIN, JJ., concur.