COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-237-CV

 

 

JAMES
CLIFTON VESTAL, M.D.,                                          APPELLANTS

UROLOGY ASSOCIATES OF 

NORTH TEXAS, BRENDA 

GOLDSTON, AND USMD

HOSPITAL AT ARLINGTON,
L.P.

 

                                                   V.

 

NORMAN
E. WRIGHT, JR. AND                                              APPELLEES

JACKLYN WRIGHT

 

                                              ------------

 

            FROM THE 48TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellants James Clifton Vestal, M.D.,  Urology Associates of North Texas  (AUANT@),
Brenda Goldston, and USMD Hospital at Arlington, L.P. (AUSMD@) appeal
from the trial court=s denial of their motions to
dismiss the claims of Appellees Norman E. Wright, Jr. and Jacklyn Wright for
failure to comply with section 74.351 of the Texas Civil Practice &
Remedies Code.[2]  Because we hold that the expert reports
provided were adequate for some of the Wrights= claims
but not for others, we affirm in part and reverse and remand in part.

                                        Background
Facts

Mr. Wright has multiple myeloma, a type of cancer
involving bone marrow cells.  In 2005,
Dr. Vestal, a partner in UANT, performed a procedure on Mr. Wright to remove a
cancerous growth on his right kidney. 
After the procedure, a CT scan showed fluid collection around the kidney
and hydronephrosis, a backup of urine in the kidney due to blockage.  A CT scan ordered by Dr. Vestal three months
later showed the same fluid collection and hydronephrosis.  Accordingly, Dr. Vestal recommended a
procedure to insert a stent that would run from the kidney, through the ureter,
and into the bladder.








On October 20, 2005, Dr. Vestal performed the
procedure to insert the stent; Nurse Goldston assisted as an operating room
nurse.  The procedure was performed at
USMD.  Dr. Vestal incorrectly inserted
the stent into the left kidney rather than the right, but he did not discover
the error at that time.  Dr. Vestal did
note in a follow-up procedure in early November that Astrangely
enough, [Mr. Wright=s] left side started hurting
immediately after surgery.@  An ultrasound performed on December 12, 2005,
showed a backup of urine in the right kidney due to blockage and the absence of
a stent in the right kidney.  Another CT
scan was performed on December 27, 2005. 
On January 4, 2006, after another CT scan, Dr. Vestal acknowledged that
the stent had been placed in the incorrect kidney.

The next day, Mr. Wright underwent a procedure to
have a stent inserted into the right kidney. 
Approximately three weeks later, on January 24, it was discovered that
the end of the new stent was not in the kidney but instead had perforated the
ureter and was outside of the kidney=s
collection system.  This stent was
removed on January 27, 2006.  In
February, a doctor at the hospital where Mr. Wright had gone for cancer
treatment performed tests that showed that Mr. Wright=s right
kidney was functioning poorly.  Three
days later, doctors placed a percutaneous nephrostomy into Mr. Wright=s right
kidney.  A percutaneous nephrostomy is a
plastic tube inserted directly into the kidney and requires the patient to wear
an external bag.  As of July 2006, Mr.
Wright had lost about a third of his kidney excretory function.








                                        Procedural
History

The Wrights filed suit on October 19, 2007, against
Dr. Vestal, UANT, Nurse Goldston, and USMD. 
On February 19, 2008, they filed two expert reports in order to comply
with section 74.351:  one written by
Michelle Byrne, RN, and one written by Martin Gelbard, M.D.

UANT moved to dismiss the Wrights= claims
on the ground that Dr. Gelbard=s report
did not reference UANT.  Dr. Vestal moved
to dismiss on the grounds that Dr. Gelbard failed to explain how Dr. Vestal=s
alleged breaches limit Mr. Wright=s
treatment options for multiple myeloma to those that do not require normal
kidney function and that Dr. Gelbard is not qualified to give adverse causation
opinions on multiple myeloma.  Dr. Vestal
and UANT also filed a motion to strike Nurse Byrne=s report
on the ground that as a nurse, she could not provide causation testimony.

Nurse Goldston filed a motion to dismiss on the grounds
that (1) Nurse Byrne=s report was deficient because
she is not qualified to give causation testimony, the report was conclusory as
to violations of the standard of care, and the report did not make specific
reference to the conduct of Nurse Goldston that Nurse Byrne claimed fell below
the standard of care; and (2) Dr. Gelbard=s report
failed to reference Nurse Goldston at all.








USMD moved to dismiss on the grounds that Dr.
Gelbard=s report
fails to connect any alleged breach of the standard of care to the wrong
placement of the stent and that the report fails to establish any causal
relationship between the alleged failure of USMD and its staff and the injury,
harm, or damages claimed.  USMD also
asserted that Nurse Byrne=s report is conclusory and Ajust
assumes . . . because . . . there was an alleged wrong site
surgery that there was a breach of the standard of care.@  The trial court denied the motions.

                      Expert
Reports in Health Care Liability Claims

Section 74.351 sets out certain requirements for
a plaintiff asserting a health care liability claim.[3]  Under that section, the plaintiff must serve
on each party one or more expert reports for each physician or health care
provider against whom the plaintiff has asserted a claim.[4]  AExpert
report@ is
defined as a report that provides Aa fair
summary of the expert=s opinions . . . regarding
applicable standards of care, the manner in which the care rendered by the
physician or health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed.@[5]  The report must attach the curriculum vitae
of each expert listed in the report.[6]








If, as to a defendant physician or health care
provider, no expert report is served within 120 days after the plaintiff filed
his original petition, the affected physician or health care provider may move
to dismiss the plaintiff=s claim against that party; the
trial court must grant this motion.[7]  If a report is served but the trial court
finds it deficient, the court may grant the plaintiff a thirty-day extension to
cure the deficiencies.[8]  If the plaintiff does file a report, and the
defendant files a motion challenging it, the trial court shall grant the motion
only if the court determines, after a hearing, Athat the
report does not represent an objective good faith effort to comply with the
definition of an expert report.@[9]








To demonstrate a Agood
faith effort,@ the report must Adiscuss
the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit.@[10]  A plaintiff is not required to serve one
expert report that meets all the requirements of section 74.351; a plaintiff
may satisfy the requirements of section 74.351 by serving reports of separate
experts regarding different defendants or different issues.[11]

The section sets out specific requirements for
who is qualified to give an opinion on the elements required in an expert
report.[12]  To give an opinion about whether the alleged
breach of the standard of care caused the plaintiff=s
injury, the expert must be a physician who is Aotherwise
qualified to render opinions on such causal relationship under the Texas Rules
of Evidence.@[13]

With respect to an opinion about whether a
physician breached the relevant standard of care, the expert giving the report
must meet the requirements of section 74.401.[14]  Among other things, the expert must be
someone who is practicing medicine at the time the testimony is given or was
practicing medicine at the time the claim arose; Ahas
knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim@; and Ais
qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of medical care.@[15]








For a person giving an opinion about whether a
health care provider, as opposed to a physician, breached the relevant standard
of care, the expert must meet the requirements of section 74.402.[16]  Under that section, the expert must be
someone who is Apracticing health care in a
field of practice that involves the same type of care or treatment as that
delivered by the defendant health care provider@; Ahas
knowledge of accepted standards of care for health care providers for the
diagnosis, care, or treatment of the illness, injury, or condition involved in
the claim@; and Ais
qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of health care.@[17]








                                       Standard
of Review

We review for an abuse of discretion a trial
court=s denial
of a motion to dismiss under section 74.351.[18]  We also review for an abuse of discretion a
trial court=s determination of a physician=s
qualifications to offer an expert opinion in a health care liability claim.[19]  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.[20]

                                               Analysis

Dr. Vestal

In one issue, Dr. Vestal and UANT argue that the
trial court abused its discretion by determining that the expert report filed
by the Wrights complied with the applicable statutory requirements.  We first consider this issue as to Dr.
Vestal.








Dr. Vestal first argues that Dr. Gelbard=s report
is deficient because it Adoes not causally connect Dr.
Vestal=s
alleged breaches of a standard of care with any of the injuries [Mr. Wright]
allegedly suffered.@ 
Dr. Gelbard states in his report that because Mr. Wright has lost
approximately one-third of his excretory function, A[t]his
will likely have a deleterious effect on his health by limiting his treatment
options for multiple myeloma to those that do not require normal kidney
function.@ 
Dr. Vestal contends that Dr. Gelbard Adoes not
specify how Wright, a man suffering from a form of cancer, was further
compromised by the incorrect stent placement, except that his resulting kidney
function might limit >certain treatment options= for
multiple myeloma.@ 
Dr. Vestal argues that the report contains no explanation of what the
normal or expected course of treatment for multiple myeloma is and how such
treatment is affected by his alleged breaches. 
He also complains that Dr. Gelbard did not specifically spell out why
methods for treatment of multiple myeloma that require normal kidney function
are no longer available for Mr. Wright, a man with limited kidney function.

We first note that Dr. Gelbard stated in his
report that Mr. Wright needed the stent performed because he was due to go for
chemotherapy, which requires optimal kidney function.  Thus, Dr. Gelbard stated at least one
treatment that Mr. Wright was supposed to receive but could not without normal
kidney function.  But more importantly,
the statement relied on by Dr. Vestal appeared in this portion of Dr. Gelbard=s
report:








It is my opinion beyond
reasonable medical probability that the failure to relieve obstruction in Mr.
Wright=s right kidney caused
it to be permanently damaged.  This
failure was the direct result of placing the stent on the wrong side,
then failing to recognize that for about 22 months. 
In the obstructed kidney, the outflow of urine through the filtration
system is exposed to elevated back pressure. 
In other words, the kidney can only effectively filter waste products
when the output end of the filtration system is at low pressures.  By failing to place a stent properly and
leaving the situation without correction for 22 months, the filtration
system in the kidney . . . is exposed to prolonged, abnormally high pressures
and undergoes irreversible structural changes leading to loss of overall kidney
function.  This limits the ability of the
body to excrete waste products normally. 
Furthermore, the collecting system (ureter and renal pelvis) on the
right side was irreparably damaged subsequent to that time by a
perforation of the ureteropelvic junction, leaving the upper end of the stent
outside the kidney, and failing to recognize the problem.  Based on the creatinine clearance values
cited earlier in this report, Mr. Wright has lost approximately one third of
his excretory function.  This will
likely have a deleterious effect on his health by limiting his treatment
options for multiple myeloma to those that do not require normal kidney
function.

 

In summary, it is my
opinion beyond a reasonable medical probability, based on my education,
training and experience that Dr. Vestal and [UANT] were negligent in their care
and treatment of Norman Wright.  Further,
it is my opinion that each of these acts and omissions of negligence was a
proximate cause to the irreversible damage of his right kidney, loss of its
function, and the resultant symptoms and impairments caused by the improper
stenting of Mr. Wright=s kidney on October 20[,]
2005 and again on January 5[,] 2006. 
[Emphasis added]

 








Thus, in addition to stating that Mr. Wright will
have to limit his treatment options for his cancer to those that do not require
normal kidney function, Dr. Gelbard also stated that the improper placement of
the stent and the failure to recognize and properly treat the problem caused
permanent damage to Mr. Wright=s right
kidney and a loss of one third of his kidney function.  Furthermore, the report stated that Dr.
Vestal=s
improper placement of the stent, which caused the perforation of Mr. Wright=s
ureteropelvic junction, permanently damaged the collecting system on Mr. Wright=s right
side.  Dr. Gelbard thus gave his opinion
on how Dr. Vestal=s improper treatment of Mr.
Wright resulted in injury to him.

In his reply brief, Dr. Vestal argues that the
loss of one-third of excretory function does not satisfy the causation
requirement because it does not show that such loss caused some form of
compensable damage.  He characterizes the
Wrights= arguments
as a statement that Ajust because a stent was placed
in the incorrect kidney, it is [sic] goes without saying that [Mr.] Wright has
suffered harm.@ 
Dr. Vestal did not point this court to any statute or caselaw, and we
have found none, that requires the expert to opine that the plaintiff=s
physical injury is one that is Acompensable.@  It is adequate that Dr. Gelbard stated
clearly how the actions of Dr. Vestal resulted in permanent physical injury to
Mr. WrightCpermanent damage to Mr. Wright=s kidney
and collecting system.








Dr. Vestal further contends that Dr. Gelbard is
unqualified to render an opinion about the treatment of multiple myeloma.  Dr. Gelbard stated in his report that he had Aextensive
experience with the diagnosis and treatment of kidney cancer.@  He has also published a paper on
leiomyosarcoma of the renal vein.[21]  But even if this experience would not qualify
him to opine on whether treatment for the specific type of cancer that Mr.
Wright suffers from requires optimal kidney function, a conclusion that we are
not drawing, the report was still adequate as to causation in light of Dr.
Gelbard=s other
statements on causation.

Because we hold that Dr. Gelbard=s report
is adequate as to Dr. Vestal, we do not consider his argument regarding Nurse
Byrne.[22]  We overrule this issue as to Dr. Vestal.

UANT

We next address the arguments relating to the
Wrights= claims
against UANT.  UANT first argues that the
vicarious liability claims asserted by the Wrights were based solely on Dr.
Vestal=s
conduct and that Dr. Gelbard=s report
cannot be used to bootstrap those claims because no pleading supports
them.  UANT contends that nothing in the
petition or in Dr. Gelbard=s report
describes the agency relationship between Dr. Vestal and UANT, especially when
Dr. Vestal is alleged to be a partner, not an employee, of UANT.  We disagree.








The Wrights alleged in their petition that ADr.
Vestal is an owner/partner of [UANT,] making [UANT] jointly and severally
liable for the actions of Dr. Vestal through actual or constructive agency.@[23]  Thus, the Wrights expressly sought to hold
UANT liable for the acts of Dr. Vestal under an agency theory.

As for the agency relationship, the Wrights
expressly stated that Dr. Vestal is a partner of UANT, Amaking
[UANT] . . . liable for the actions of Dr. Vestal.@  Thus, the Wrights alleged an agency
relationship based on Dr. Vestal=s status
as a partner.








UANT is a limited liability partnership (ALLP@).  An LLP is a general partnership in which the
partners have limited liability for the partnership=s
obligations.[24]  Under the law governing general partnerships,
A[e]ach
partner is an agent of the partnership for the purpose of its business.@[25]  By statute, a general partnership is
expressly liable Afor loss or injury to a person .
. . or for a penalty caused by or incurred as a result of a wrongful act or
omission or other actionable conduct of a partner acting . . . in the ordinary
course of business of the partnership.@[26]  Thus, UANT is liable for the wrongful acts of
one of its partners, such as Dr. Vestal, when the partner was acting in the
ordinary course of the partnership=s
business.[27]








A plaintiff asserting a health care liability
claim against a principal does not have to provide a separate expert report
regarding the principal when the claim is premised on the acts of the principal=s agent
for which the plaintiff seeks to hold the principal vicariously liable.[28]  Accordingly, the Wrights did not have to
provide an expert report as to UANT for those claims premised on UANT=s
vicarious liability for the acts of Dr. Vestal.[29]  Rather, they had to provide an adequate expert
report only as to Dr. Vestal.[30]  Because we have held that Dr. Gelbard=s expert
report was adequate on causation as to Dr. Vestal, it was also adequate on
causation as to UANT on the vicarious liability claims against UANT for the
acts of Dr. Vestal.

The Wrights also alleged numerous direct
liability claims against UANT that were not based on the acts of Dr. Vestal (Adirect
liability claims@), including a claim that it
failed to properly supervise its employees and independent contractors.  Although Dr. Gelbard asserted in his
conclusion that UANT was negligent, he did not state the standard of care applicable
to partnerships that provide health care, how UANT breached that standard, or
how the breach caused injury to Mr. Wright. 
This report was therefore deficient as to UANT on the direct liability
claims.  Similarly, although Nurse Byrne
stated that in her opinion, UANT was negligent in its care and treatment of Mr.
Wright, even assuming that Nurse Byrne was qualified to give expert testimony
about a partnership that provides health care, she did not describe what
actions of UANT breached the standard of care applicable to such partnerships
or how UANT=s actions resulted in the
incorrect stent placement.  Neither Dr.
Gelbard=s nor
Nurse Byrne=s report was adequate as to UANT
on the Wrights= direct liability claims.[31]  Accordingly, we sustain UANT=s issue
as to the direct liability claims and overrule it as to the Wrights=
vicarious liability claims.








Nurse Goldston and USMD filed a joint brief on
appeal, arguing in one issue that the trial court abused its discretion by
refusing to dismiss the Wrights= claims
against them.  They contend that neither
the report of Nurse Byrne nor the report of Dr. Gelbard complies with the
statutory expert report requirements. 
Specifically, they argue that neither report addresses causation as to
either Nurse Goldston or USMD; that both reports fail to specify any act or
omission as to Nurse Goldston; and that Nurse Byrne=s report
is conclusory with respect to alleged violations by USMD.

Nurse Goldston

Turning first to the arguments with respect to
Nurse Goldston, we determine whether the reports point out an act or omission
in breach of a standard of care by Nurse Goldston and if they address
causation.








With respect to a standard of care, Dr. Gelbard
stated in his report that kidney procedures such as the one performed on Mr.
Wright must be done with Aevery precaution to ensure the
proper site is identified and operated@ and
that A[t]his
is the responsibility of the surgeon as well as other ancillary operating room
personnel.@ 
He stated that A[t]he operative nursing records
should have identified everyone in the operating room, including xray
technologists, and none were noted@ and
that A[i]n the
perioperative nursing record there is a box for xray disposition, which should
have documented the imaging and the disposition of the images, if any@ but A[i]nstead
it was marked >N.A.=@  He also noted that the records did not
include an admitting history and physical completed upon Mr. Wright=s
admission.  And Dr. Gelbard further
stated that under appropriate patient care, A[u]pon
admission for stenting to relieve an obstructed kidney, the proper procedure to
prevent wrong side injury should have been in place, as detailed in the nursing
report of [Nurse Byrne].@

Nurse Byrne=s report
set forth the standard of care for surgical nurses.  Byrne stated in her report that national
standards for nursing care for surgical patients includes the prevention of
injury from wrong site surgery, and she explained that nurses caring for
surgical patients are supposed to follow Atime out@
procedures to conduct a final verification of the correct surgery site.  She further stated that A[i]t is
an essential standard of care that the periopoerative nurses ensure that a
current . . . consent form and history [and] physical form are accurately
completed with the laterality explicated and present on the patient=s chart
prior to the surgical procedure.@  Accordingly, both Dr. Gelbard and Nurse Byrne
both set out a standard of care applicable to nurses assisting with surgical
procedures.








With respect to a breach of the standard of care,
Nurse Byrne stated that the breach of the standard of care obvious from the
nurses=
documentation was the absence of a perioperative verification process as well
as essential documents missing from the medical record.  But Nurse Byrne mentioned Nurse Goldston only
once:  she stated that a nurse=s note
in the perioperative record noted that the intraoperative surgical procedure
site re‑verification by Atime out@ was
completed by four nurses, including ABG.@  Thus, ABG@ was one
of the nurses who performed the site re‑verification procedures that
Nurse Byrne stated were necessary under the standard of care.  And yet, Nurse Byrne noted, it was unclear
from the surgery records whether the surgical site was marked or what process
the staff had used in completing the time out procedures.

Nurse Byrne did not specifically mention Nurse
Goldston anywhere else in her report, and Dr. Gelbard did not mention her
specifically at all.  Thus, the only breach
of the standard of care that was alleged against Nurse Goldston specifically
was that she participated in the site re‑verification procedure but that
the records were not clear what procedure was actually followed.








Although both Nurse Byrne and Dr. Gelbard stated
that it was the responsibility of operating room personnel to make sure the
appropriate records were available and that from the records, it appeared that
imaging studies that should have been available were not in the operating room
during surgery, neither asserted that it was Nurse Goldston=s
responsibility to ensure that appropriate xray and imaging studies were
available in the operating room or that she breached a standard of care by
failing to do so.  Similarly, although
both Dr. Gelbard and Nurse Byrne noted that no history and physical appeared in
the medical records, Nurse Byrne did not assert that it was Nurse Goldston=s
responsibility to make sure that a completed patient history and physical were
performed upon a patient=s admission or that she breached
the standard of care by failing to make sure that a history was taken and a
physical performed.  Thus, although both
Dr. Gelbard and Nurse Byrne indicated that there was a breach of the standard
of care applicable to nurses, neither specifically  implicated any conduct particular to Nurse
Goldston, other than a failure to clarify what site re-verification procedures
were used.








Most importantly, as for causation, Dr. Gelbard
stated that certain procedures must be followed by all operating room personnel
to ensure correct site surgery.  He also
stated that the failure to correctly place the stent and to recognize its
misplacement caused Mr. Wright to suffer permanent loss of kidney
function.  But he did not connect those
two statements; that is, he did not provide an explanation or opinion as to how
the failure to follow site re-verification procedures, or any of the other
claimed departures from the standard of care by the nurses, caused Dr. Vestal
to misplace the stents or to fail to recognize the misplacement, which
ultimately caused Mr. Wright to suffer the injuries alleged.[32]  Accordingly, although Dr. Gelbard=s report
made statements that point to causation with respect to Nurse Goldston, under
the law, it was inadequate on that element.[33]








Nurse Byrne gave her opinion as to causation, but
as a nurse, she is not qualified to opine on medical causation in an expert
report provided under section 74.351.[34]  Dr. Gelbard could have incorporated her
report into his and adopted her opinion as his own,[35]
but he did not do so; he only referenced her report once, when he stated that Athe
proper procedure to prevent wrong side injury should have been in place, as
detailed in the nursing report of [Nurse Byrne].@  Furthermore, even if he had incorporated or
adopted her report, Nurse Byrne=s report
was also inadequate as to causation. 
Although she stated that the breaches she pointed out Aled to
an incorrect surgical site procedure,@ she did
not explain how the failure to follow site re-verification procedures,
or any of the other claimed departures from the standard of care by the nurses,
caused Dr. Vestal to misplace the stents or fail to recognize the
misplacement.  Thus, the expert reports
were deficient.  Accordingly, we sustain
this issue as to Nurse Goldston.

USMD

Finally, we consider USMD=s
argument that the trial court erred by denying its motion to dismiss.  The Wrights claimed that USMD was negligent
by and through its employees and agents, including Nurse Goldston.  Specifically, they alleged that USMD=s
employees and agents provided assistance, including but not limited to improper
preoperative preparation and completion of the site checklist upon which Dr.
Vestal may have relied.  They further
alleged that USMD=s employees and agents provided
assistance during the procedure in which the stent was mistakenly placed in Mr.
Wright=s left
kidney and, consequently, that USMD was negligent for the wrongful stent
placement.

As it did in its motion to dismiss, USMD asserts
on appeal that Nurse Byrne=s report
is conclusory as to a breach of the standard of care and that she was not
qualified to give an opinion on causation. 
It further asserts that Dr. Gelbard=s report
fails to identify any causal link between a breach of the standard of care by
it or Nurse Goldston and any injury to Mr. Wright.








USMD may be held vicariously liable for the acts
of its employees.[36]  Thus, if the Wrights provided an expert
report that was adequate as to USMD=s
employees, then those reports are adequate for their vicarious liability claims
against USMD.[37]  We have held that the reports of Dr. Gelbard
and Nurse Byrne were deficient as to Nurse Goldston.  We now consider whether those reports were
adequate as to any other USMD employee.








Both Dr. Gelbard and Nurse Byrne gave opinions on
the standard of care applicable to nurses, and Dr. Gelbard went as far as
expressing a standard of care for all operating room personnel.  Both included as part of the standard of care
a completion of a patient history and a physical examination, the results of
which should be included in the hospital chart and available in the operating
room.  Both noted that these records were
not included in Mr. Wright=s
chart.  Dr. Gelbard further stated that
operating room personnel should make sure that the appropriate imaging studies
were available in the operating room and that this was not done.  Both noted that certain procedures should be
followed by nurses caring for surgical patients, and Nurse Byrne stated that
the hospital records did not indicate whether these procedures were correctly
followed.  Thus, both Dr. Gelbard and
Nurse Byrne discussed the standard of care and how it was breached.[38]








As for causation, Dr. Gelbard did not detail or
explain how the nurses= or other staff members= failure
to ensure that the preoperative imaging studies were in the operating room
caused Dr. Vestal to misplace the stent the first time and fail to identify the
error or to misplace the stent a second time.[39]  He did state that having the preoperative
imaging studies in the operating room would have helped to confirm the proper
side and that flouroscopic monitoring during the procedure would have Ain all
likelihood@ identified the error.  But he also stated that the November follow
up appointment should have alerted Dr. Vestal to the error but that he failed
to recognize it and that the December follow up appointment and ultrasound also
should have alerted Dr. Vestal to the error but that he again failed to
recognize it.  Thus, in light of these
statements, Dr. Gelbard needed to explain how having imaging studies and
flouroscoping on the day of the surgery would have caused Dr. Vestal to
recognize the error and that the failure to have those aides resulted in Dr.
Vestal not recognizing the error until a time when permanent injury had been
done.  And Dr. Gelbard never specifically
implicated the acts of any person other than Dr. Vestal as causing the improper
stent placements or the failure to recognize the misplacements or alleged that
some other act caused Mr. Wright=s
injuries.  Accordingly, Dr. Gelbard=s report
was inadequate as to USMD.

The Wrights point to an affidavit of Dr. Gelbard
that they filed in the trial court after the motions to dismiss were
filed.  Nurse Goldston and USMD argue
that the trial court could not consider this affidavit and that it was
inadequate to remedy the defects of the expert reports.  In the affidavit, Dr. Gelbard said that

in stating in my Expert Report that Ait is my
opinion that each of these acts . . . was a proximate cause . . . ,@ it was
my intention to reference all the acts or omissions of negligence detailed in
my Expert Report with regard to all the health care personnel involved in Mr.
Wright=s
treatment. . . .  That is to say, my
opinion as to causation was not intended to merely be limited to the acts or
omissions of Dr. Vestal and [UANT], but was instead intended to be in reference
to all those health care professionals referenced in my Expert Report and
referenced in Nurse Byrne=s report.








Even if the trial court could have considered this affidavit as part
of Dr. Gelbard=s expert report, this affidavit
does not help the Wrights.  The affidavit
does not provide the information lacking in the first report:  how the claimed departures from the standard
of care by the nurses or any other hospital personnel caused Dr. Vestal to
misplace the stents or fail to recognize the misplacement.  Accordingly, we sustain USMD=s sole
issue.








                                             Conclusion

Having overruled Dr. Vestal=s sole
issue, we affirm the trial court=s order
as to the Wrights= claims against him.  Having overruled in part UANT=s sole
issue, we affirm the trial court=s order
denying UANT=s motion to dismiss the Wrights= claims
based on the actions of Dr. Vestal. 
Having sustained USMD and Nurse Goldston=s sole
issue and having sustained in part UANT=s sole
issue, we reverse the trial court=s order
on the Wrights= direct liability claims against
UANT and the Wrights= claims against USMD and Nurse
Goldston.  We remand the case for the
trial court=s determination whether to grant
the Wrights a thirty-day extension to cure the deficiencies in the expert
reports as to those claims.

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

 

DELIVERED:  August 31, 2009











[1]See Tex. R. App. P. 47.4.





[2]Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351 (Vernon Supp
2008).





[3]See id.





[4]See id. ' 74.351(a).





[5]Id. ' 74.351(r)(6).





[6]Id. ' 74.351(a).





[7]Id. ' 74.351(b).





[8]Id. ' 74.351(c).





[9]Id. ' 74.351(l).





[10]Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (construing
predecessor statute, former art. 4590i, ' 13.01).





[11]Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(i).





[12]See id. ' 74.351(r)(5).





[13]Id. ' 74.351(r)(5)(C).





[14]Id. ' 74.351(r)(5)(A), ' 74.401 (Vernon 2005).





[15]Id. ' 74.401(a).





[16]Id. '' 74.351(r)(5)(B), 74.402.





[17]See id. ' 74.402(b).





[18]Moore v. Gatica, 269 S.W.3d 134, 139
(Tex. App.CFort Worth 2008, pet.
denied).





[19]Id.





[20]Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied, 476 U.S.
1159 (1986).





[21]See McGarry v. Horlacher, 149 Ohio App. 3d 33, 36,
775 N.E.2d 865, 867 (2002) (noting that leiomyosarcoma is an aggressive
cancer).





[22]See Tex. R. App. R. 47.1.





[23]See In re Enron Corp.
Sec., Derivative & ERISA Litigation, 623 F. Supp. 2d 798, 834 n.33
(S.D. Tex. 2009) (noting that although they express two different concepts, the
legal terms Avicariously liable@ and Ajointly and severally
liable@ are sometimes used
interchangeably).





[24]Tex. Rev. Civ. Stat. Ann.
art. 6132b‑3.08(a) (Vernon Supp. 2008); Tex. Bus. Orgs. Code Ann. ' 152.801 (Vernon 2008);
19 Robert W. Hamilton et al., Texas Practice: Business Organizations ' 1.7 (2d ed. 2004); see
also Tex. Bus. Orgs. Code Ann. '' 152.805, 153.351 (Vernon 2008) (providing that a
limited partnership may also take advantage of limited liability protection and
becoming a limited liability limited partnership); Tex. Rev. Civ. Stat. Ann.
art. 6132b‑3.08(e).





[25]Tex. Bus. Orgs. Code Ann.
' 152.301 (Vernon 2008);
Tex. Rev. Civ. Stat. Ann. art. 6132b‑3.02 (Vernon Supp. 2008); see
also Kao Holdings, L.P. v. Young, 261 S.W.3d 60, 63 (Tex. 2008)
(noting that Aa partnership is liable
for acts of a partner done with authority or in the ordinary course of the
partnership=s business@).





[26]Tex. Bus. Orgs. Code Ann.
' 152.303 (Vernon 2008);
Tex. Rev. Civ. Stat. Ann. art. 6132b‑3.03 (Vernon Supp. 2008).





[27]See Tex. Bus. Orgs. Code Ann.
' 152.303; Tex. Rev. Civ.
Stat. Ann. art. 6132b‑3.03.





[28]See Gardner v. U.S.
Imaging, Inc., 274 S.W.3d 669, 671B72 (Tex. 2008) (AWhen a party=s alleged health care
liability is purely vicarious, a report that adequately implicates the actions
of that party=s agents or employees is
sufficient.@).





[29]See id.





[30]See id.





[31]See Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(c).





[32]See Collini v. Pustejovsky, 280 S.W.3d 456, 467
(Tex. App.CFort Worth 2009, no pet.)
(holding that expert report was inadequate because it failed to provide any
medical detail as to how doctor=s prescription of medication caused the harm
alleged).





[33]See id.





[34]See Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351 (r)(5)(C), (r)(6)
(defining Aexpert report@ as a written report
provided by an Aexpert@ and defining Aexpert@ with respect to
causation as Aa physician who is
otherwise qualified to render opinions on such causal relationship under the
Texas Rules of Evidence@) (emphasis added); Benish
v. Grottie, 281 S.W.3d 184, 205 (Tex. App.CFort Worth 2009, pet.
denied).





[35]See Kelly v. Rendon, 255 S.W.3d 665, 676
(Tex. App.CHouston [14th Dist.]
2008, no pet.).





[36]See Gardner, 274
S.W.3d at 671B72; RGV Healthcare
Assocs., Inc. v. Estevis, No. 13‑08‑00113‑CV, 2009 WL
1886889, at *7 (Tex. App.CCorpus Christi July 2,
2009, no pet.) (stating that for claims of vicarious liability, an expert
report is adequate as to a hospital defendant if that report adequately
addresses the employee for whom plaintiff seeks to hold the hospital
vicariously liable).





[37]See Gardner, 274 S.W.3d at 671B72; see also Univ. of
Tex. Sw. Med. Ctr. v. Dale, 188 S.W.3d 877, 879 (Tex. App.CDallas 2006, no pet)
(concluding that plaintiffs need not mention defendant hospital in expert
report when plaintiffs limited their claim against hospital to vicarious
liability for employees).





[38]See Univ. of Tex. Med.
Branch v. Railsback, 259 S.W.3d 860, 867B68 (Tex. App.CHouston [1st Dist.] 2008, no pet.) (noting that
courts of appeals Ahave found adequate
expert reports in cases where a plaintiff has sued a hospital only and referred
to its nurses collectively in order to establish the hospital=s vicarious liability@); Kettle v. Baylor
Med. Ctr. at Garland, 232 S.W.3d 832, 841 (Tex. App.CDallas 2007, pet. denied)
(holding that expert report was adequate as to vicarious liability claims
against hospital when report discussed collectively the breach of the standard
of care by the hospital=s nurses).





[39]See Collini, 280 S.W.3d at 467.