

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-08-237-CV**

JAMES CLIFTON VESTAL, M.D.,            APPELLANTS
UROLOGY ASSOCIATES OF
NORTH TEXAS, BRENDA
GOLDSTON, AND USMD
HOSPITAL AT ARLINGTON, L.P.

V.

NORMAN E. WRIGHT, JR. AND            APPELLEES
JACKLYN WRIGHT

------------

## FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants James Clifton Vestal, M.D., Urology Associates of North

Texas ("UANT"), Brenda Goldston, and USMD Hospital at Arlington, L.P.

("USMD") appeal from the trial court's denial of their motions to dismiss the

---

[1] *See* Tex. R. App. P. 47.4.

claims of Appellees Norman E. Wright, Jr. and Jacklyn Wright for failure to comply with section 74.351 of the Texas Civil Practice & Remedies Code.[2] Because we hold that the expert reports provided were adequate for some of the Wrights' claims but not for others, we affirm in part and reverse and remand in part.

## Background Facts

Mr. Wright has multiple myeloma, a type of cancer involving bone marrow cells. In 2005, Dr. Vestal, a partner in UANT, performed a procedure on Mr. Wright to remove a cancerous growth on his right kidney. After the procedure, a CT scan showed fluid collection around the kidney and hydronephrosis, a backup of urine in the kidney due to blockage. A CT scan ordered by Dr. Vestal three months later showed the same fluid collection and hydronephrosis. Accordingly, Dr. Vestal recommended a procedure to insert a stent that would run from the kidney, through the ureter, and into the bladder.

On October 20, 2005, Dr. Vestal performed the procedure to insert the stent; Nurse Goldston assisted as an operating room nurse. The procedure was performed at USMD. Dr. Vestal incorrectly inserted the stent into the left kidney rather than the right, but he did not discover the error at that time. Dr. Vestal did note in a follow-up procedure in early November that "strangely

---

[2] Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp 2008).

enough, [Mr. Wright's] left side started hurting immediately after surgery." An ultrasound performed on December 12, 2005, showed a backup of urine in the right kidney due to blockage and the absence of a stent in the right kidney. Another CT scan was performed on December 27, 2005. On January 4, 2006, after another CT scan, Dr. Vestal acknowledged that the stent had been placed in the incorrect kidney.

The next day, Mr. Wright underwent a procedure to have a stent inserted into the right kidney. Approximately three weeks later, on January 24, it was discovered that the end of the new stent was not in the kidney but instead had perforated the ureter and was outside of the kidney's collection system. This stent was removed on January 27, 2006. In February, a doctor at the hospital where Mr. Wright had gone for cancer treatment performed tests that showed that Mr. Wright's right kidney was functioning poorly. Three days later, doctors placed a percutaneous nephrostomy into Mr. Wright's right kidney. A percutaneous nephrostomy is a plastic tube inserted directly into the kidney and requires the patient to wear an external bag. As of July 2006, Mr. Wright had lost about a third of his kidney excretory function.

## Procedural History

The Wrights filed suit on October 19, 2007, against Dr. Vestal, UANT, Nurse Goldston, and USMD. On February 19, 2008, they filed two expert reports in order to comply with section 74.351: one written by Michelle Byrne, RN, and one written by Martin Gelbard, M.D.

UANT moved to dismiss the Wrights' claims on the ground that Dr. Gelbard's report did not reference UANT. Dr. Vestal moved to dismiss on the grounds that Dr. Gelbard failed to explain how Dr. Vestal's alleged breaches limit Mr. Wright's treatment options for multiple myeloma to those that do not require normal kidney function and that Dr. Gelbard is not qualified to give adverse causation opinions on multiple myeloma. Dr. Vestal and UANT also filed a motion to strike Nurse Byrne's report on the ground that as a nurse, she could not provide causation testimony.

Nurse Goldston filed a motion to dismiss on the grounds that (1) Nurse Byrne's report was deficient because she is not qualified to give causation testimony, the report was conclusory as to violations of the standard of care, and the report did not make specific reference to the conduct of Nurse Goldston that Nurse Byrne claimed fell below the standard of care; and (2) Dr. Gelbard's report failed to reference Nurse Goldston at all.

USMD moved to dismiss on the grounds that Dr. Gelbard's report fails to connect any alleged breach of the standard of care to the wrong placement of

the stent and that the report fails to establish any causal relationship between the alleged failure of USMD and its staff and the injury, harm, or damages claimed. USMD also asserted that Nurse Byrne's report is conclusory and "just assumes . . . because . . . there was an alleged wrong site surgery that there was a breach of the standard of care." The trial court denied the motions.

**Expert Reports in Health Care Liability Claims**

Section 74.351 sets out certain requirements for a plaintiff asserting a health care liability claim.[3] Under that section, the plaintiff must serve on each party one or more expert reports for each physician or health care provider against whom the plaintiff has asserted a claim.[4] "Expert report" is defined as a report that provides "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[5] The report must attach the curriculum vitae of each expert listed in the report.[6]

If, as to a defendant physician or health care provider, no expert report is served within 120 days after the plaintiff filed his original petition, the

---

[3] *See id.*

[4] *See id.* § 74.351(a).

[5] *Id.* § 74.351(r)(6).

[6] *Id.* § 74.351(a).

affected physician or health care provider may move to dismiss the plaintiff's claim against that party; the trial court must grant this motion.[7] If a report is served but the trial court finds it deficient, the court may grant the plaintiff a thirty-day extension to cure the deficiencies.[8] If the plaintiff does file a report, and the defendant files a motion challenging it, the trial court shall grant the motion only if the court determines, after a hearing, "that the report does not represent an objective good faith effort to comply with the definition of an expert report."[9]

To demonstrate a "good faith effort," the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit."[10] A plaintiff is not required to serve one expert report that meets all the requirements of section 74.351; a plaintiff may satisfy the requirements of section 74.351 by

---

[7] *Id.* § 74.351(b).

[8] *Id.* § 74.351(c).

[9] *Id.* § 74.351(*l*).

[10] *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001) (construing predecessor statute, former art. 4590i, § 13.01).

serving reports of separate experts regarding different defendants or different issues.[11]

The section sets out specific requirements for who is qualified to give an opinion on the elements required in an expert report.[12] To give an opinion about whether the alleged breach of the standard of care caused the plaintiff's injury, the expert must be a physician who is "otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence."[13]

With respect to an opinion about whether a physician breached the relevant standard of care, the expert giving the report must meet the requirements of section 74.401.[14] Among other things, the expert must be someone who is practicing medicine at the time the testimony is given or was practicing medicine at the time the claim arose; "has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim"; and "is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care."[15]

---

[11] Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i).

[12] *See id.* § 74.351(r)(5).

[13] *Id.* § 74.351(r)(5)(C).

[14] *Id.* § 74.351(r)(5)(A), § 74.401 (Vernon 2005).

[15] *Id.* § 74.401(a).

For a person giving an opinion about whether a health care provider, as opposed to a physician, breached the relevant standard of care, the expert must meet the requirements of section 74.402.[16] Under that section, the expert must be someone who is "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider"; "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim"; and "is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care."[17]

---

[16] *Id.* §§ 74.351(r)(5)(B), 74.402.

[17] *See id.* § 74.402(b).

## Standard of Review

We review for an abuse of discretion a trial court's denial of a motion to dismiss under section 74.351.[18] We also review for an abuse of discretion a trial court's determination of a physician's qualifications to offer an expert opinion in a health care liability claim.[19] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[20]

## Analysis

*Dr. Vestal*

In one issue, Dr. Vestal and UANT argue that the trial court abused its discretion by determining that the expert report filed by the Wrights complied with the applicable statutory requirements. We first consider this issue as to Dr. Vestal.

Dr. Vestal first argues that Dr. Gelbard's report is deficient because it "does not causally connect Dr. Vestal's alleged breaches of a standard of care with any of the injuries [Mr. Wright] allegedly suffered." Dr. Gelbard states in

---

[18] *Moore v. Gatica*, 269 S.W.3d 134, 139 (Tex. App.—Fort Worth 2008, pet. denied).

[19] *Id.*

[20] *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

his report that because Mr. Wright has lost approximately one-third of his excretory function, "[t]his will likely have a deleterious effect on his health by limiting his treatment options for multiple myeloma to those that do not require normal kidney function." Dr. Vestal contends that Dr. Gelbard "does not specify how Wright, a man suffering from a form of cancer, was further compromised by the incorrect stent placement, except that his resulting kidney function might limit 'certain treatment options' for multiple myeloma." Dr. Vestal argues that the report contains no explanation of what the normal or expected course of treatment for multiple myeloma is and how such treatment is affected by his alleged breaches. He also complains that Dr. Gelbard did not specifically spell out *why* methods for treatment of multiple myeloma that require normal kidney function are no longer available for Mr. Wright, a man with limited kidney function.

We first note that Dr. Gelbard stated in his report that Mr. Wright needed the stent performed because he was due to go for chemotherapy, which requires optimal kidney function. Thus, Dr. Gelbard stated at least one treatment that Mr. Wright was supposed to receive but could not without normal kidney function. But more importantly, the statement relied on by Dr. Vestal appeared in this portion of Dr. Gelbard's report:

> It is my opinion beyond reasonable medical probability that the failure to relieve obstruction in Mr. Wright's right kidney *caused it to be permanently damaged*. This failure was the *direct result* of

placing the stent on the wrong side, then failing to recognize that for about 2 ½ months.  In the obstructed kidney, the outflow of urine through the filtration system is exposed to elevated back pressure.  In other words, the kidney can only effectively filter waste products when the output end of the filtration system is at low pressures.  By failing to place a stent properly and leaving the situation without correction for 2 ½ months, the filtration system in the kidney . . . is exposed to prolonged, abnormally high pressures and undergoes irreversible structural changes leading to loss of overall kidney function.  This limits the ability of the body to excrete waste products normally.  Furthermore, the collecting system (ureter and renal pelvis) on the right side *was irreparably damaged* subsequent to that time by a perforation of the ureteropelvic junction, leaving the upper end of the stent outside the kidney, and failing to recognize the problem.  Based on the creatinine clearance values cited earlier in this report, Mr. Wright has *lost approximately one third of his excretory function*.  This will likely have a deleterious effect on his health by limiting his treatment options for multiple myeloma to those that do not require normal kidney function.

In summary, it is my opinion beyond a reasonable medical probability, based on my education, training and experience that Dr. Vestal and [UANT] were negligent in their care and treatment of Norman Wright.  Further, it is my opinion that each of these acts and omissions of negligence was a proximate cause to the *irreversible damage of his right kidney, loss of its function, and the resultant symptoms and impairments* caused by the improper stenting of Mr. Wright's kidney on October 20[,] 2005 and again on January 5[,] 2006.  [Emphasis added]

Thus, in addition to stating that Mr. Wright will have to limit his treatment options for his cancer to those that do not require normal kidney function, Dr. Gelbard also stated that the improper placement of the stent and the failure to recognize and properly treat the problem caused permanent damage to Mr. Wright's right kidney and a loss of one third of his kidney function.

Furthermore, the report stated that Dr. Vestal's improper placement of the stent, which caused the perforation of Mr. Wright's ureteropelvic junction, permanently damaged the collecting system on Mr. Wright's right side. Dr. Gelbard thus gave his opinion on how Dr. Vestal's improper treatment of Mr. Wright resulted in injury to him.

In his reply brief, Dr. Vestal argues that the loss of one-third of excretory function does not satisfy the causation requirement because it does not show that such loss caused some form of compensable damage. He characterizes the Wrights' arguments as a statement that "just because a stent was placed in the incorrect kidney, it is [sic] goes without saying that [Mr.] Wright has suffered harm." Dr. Vestal did not point this court to any statute or caselaw, and we have found none, that requires the expert to opine that the plaintiff's physical injury is one that is "compensable." It is adequate that Dr. Gelbard stated clearly how the actions of Dr. Vestal resulted in permanent physical injury to Mr. Wright—permanent damage to Mr. Wright's kidney and collecting system.

Dr. Vestal further contends that Dr. Gelbard is unqualified to render an opinion about the treatment of multiple myeloma. Dr. Gelbard stated in his report that he had "extensive experience with the diagnosis and treatment of kidney cancer." He has also published a paper on leiomyosarcoma of the renal

vein.[21] But even if this experience would not qualify him to opine on whether treatment for the specific type of cancer that Mr. Wright suffers from requires optimal kidney function, a conclusion that we are not drawing, the report was still adequate as to causation in light of Dr. Gelbard's other statements on causation.

Because we hold that Dr. Gelbard's report is adequate as to Dr. Vestal, we do not consider his argument regarding Nurse Byrne.[22] We overrule this issue as to Dr. Vestal.

*UANT*

We next address the arguments relating to the Wrights' claims against UANT. UANT first argues that the vicarious liability claims asserted by the Wrights were based solely on Dr. Vestal's conduct and that Dr. Gelbard's report cannot be used to bootstrap those claims because no pleading supports them. UANT contends that nothing in the petition or in Dr. Gelbard's report describes the agency relationship between Dr. Vestal and UANT, especially when Dr. Vestal is alleged to be a partner, not an employee, of UANT. We disagree.

The Wrights alleged in their petition that "Dr. Vestal is an owner/partner of [UANT,] making [UANT] jointly and severally liable for the actions of Dr.

---

[21] *See McGarry v. Horlacher,* 149 Ohio App. 3d 33, 36, 775 N.E.2d 865, 867 (2002) (noting that leiomyosarcoma is an aggressive cancer).

[22] *See* Tex. R. App. R. 47.1.

Vestal through actual or constructive agency."[23] Thus, the Wrights expressly sought to hold UANT liable for the acts of Dr. Vestal under an agency theory.

As for the agency relationship, the Wrights expressly stated that Dr. Vestal is a partner of UANT, "making [UANT] . . . liable for the actions of Dr. Vestal." Thus, the Wrights alleged an agency relationship based on Dr. Vestal's status as a partner.

UANT is a limited liability partnership ("LLP"). An LLP is a general partnership in which the partners have limited liability for the partnership's obligations.[24] Under the law governing general partnerships, "[e]ach partner is an agent of the partnership for the purpose of its business."[25] By statute, a general partnership is expressly liable "for loss or injury to a person . . . or for

---

[23] *See In re Enron Corp. Sec., Derivative & ERISA Litigation*, 623 F. Supp. 2d 798, 834 n.33 (S.D. Tex. 2009) (noting that although they express two different concepts, the legal terms "vicariously liable" and "jointly and severally liable" are sometimes used interchangeably).

[24] Tex. Rev. Civ. Stat. Ann. art. 6132b-3.08(a) (Vernon Supp. 2008); Tex. Bus. Orgs. Code Ann. § 152.801 (Vernon 2008); 19 Robert W. Hamilton et al., *Texas Practice: Business Organizations* § 1.7 (2d ed. 2004); *see also* Tex. Bus. Orgs. Code Ann. §§ 152.805, 153.351 (Vernon 2008) (providing that a limited partnership may also take advantage of limited liability protection and becoming a limited liability limited partnership); Tex. Rev. Civ. Stat. Ann. art. 6132b-3.08(e).

[25] Tex. Bus. Orgs. Code Ann. § 152.301 (Vernon 2008); Tex. Rev. Civ. Stat. Ann. art. 6132b-3.02 (Vernon Supp. 2008); *see also Kao Holdings, L.P. v. Young*, 261 S.W.3d 60, 63 (Tex. 2008) (noting that "a partnership is liable for acts of a partner done with authority or in the ordinary course of the partnership's business").

a penalty caused by or incurred as a result of a wrongful act or omission or other actionable conduct of a partner acting . . . in the ordinary course of business of the partnership."[26]  Thus, UANT is liable for the wrongful acts of one of its partners, such as Dr. Vestal, when the partner was acting in the ordinary course of the partnership's business.[27]

A plaintiff asserting a health care liability claim against a principal does not have to provide a separate expert report regarding the principal when the claim is premised on the acts of the principal's agent for which the plaintiff seeks to hold the principal vicariously liable.[28]  Accordingly, the Wrights did not have to provide an expert report as to UANT for those claims premised on UANT's vicarious liability for the acts of Dr. Vestal.[29]  Rather, they had to provide an adequate expert report only as to Dr. Vestal.[30]  Because we have held that Dr. Gelbard's expert report was adequate on causation as to Dr.

---

[26] Tex. Bus. Orgs. Code Ann. § 152.303 (Vernon 2008); Tex. Rev. Civ. Stat. Ann. art. 6132b-3.03 (Vernon Supp. 2008).

[27] *See* Tex. Bus. Orgs. Code Ann. § 152.303; Tex. Rev. Civ. Stat. Ann. art. 6132b-3.03.

[28] *See Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) ("When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient.").

[29] *See id.*

[30] *See id.*

Vestal, it was also adequate on causation as to UANT on the vicarious liability claims against UANT for the acts of Dr. Vestal.

The Wrights also alleged numerous direct liability claims against UANT that were not based on the acts of Dr. Vestal ("direct liability claims"), including a claim that it failed to properly supervise its employees and independent contractors. Although Dr. Gelbard asserted in his conclusion that UANT was negligent, he did not state the standard of care applicable to partnerships that provide health care, how UANT breached that standard, or how the breach caused injury to Mr. Wright. This report was therefore deficient as to UANT on the direct liability claims. Similarly, although Nurse Byrne stated that in her opinion, UANT was negligent in its care and treatment of Mr. Wright, even assuming that Nurse Byrne was qualified to give expert testimony about a partnership that provides health care, she did not describe what actions of UANT breached the standard of care applicable to such partnerships or how UANT's actions resulted in the incorrect stent placement. Neither Dr. Gelbard's nor Nurse Byrne's report was adequate as to UANT on the Wrights' direct liability claims.[31] Accordingly, we sustain UANT's issue as to the direct liability claims and overrule it as to the Wrights' vicarious liability claims.

---

[31] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

Nurse Goldston and USMD filed a joint brief on appeal, arguing in one issue that the trial court abused its discretion by refusing to dismiss the Wrights' claims against them. They contend that neither the report of Nurse Byrne nor the report of Dr. Gelbard complies with the statutory expert report requirements. Specifically, they argue that neither report addresses causation as to either Nurse Goldston or USMD; that both reports fail to specify any act or omission as to Nurse Goldston; and that Nurse Byrne's report is conclusory with respect to alleged violations by USMD.

*Nurse Goldston*

Turning first to the arguments with respect to Nurse Goldston, we determine whether the reports point out an act or omission in breach of a standard of care by Nurse Goldston and if they address causation.

With respect to a standard of care, Dr. Gelbard stated in his report that kidney procedures such as the one performed on Mr. Wright must be done with "every precaution to ensure the proper site is identified and operated" and that "[t]his is the responsibility of the surgeon as well as other ancillary operating room personnel." He stated that "[t]he operative nursing records should have identified everyone in the operating room, including xray technologists, and none were noted" and that "[i]n the perioperative nursing record there is a box for xray disposition, which should have documented the imaging and the disposition of the images, if any" but "[i]nstead it was marked 'N.A.'" He also

noted that the records did not include an admitting history and physical completed upon Mr. Wright's admission. And Dr. Gelbard further stated that under appropriate patient care, "[u]pon admission for stenting to relieve an obstructed kidney, the proper procedure to prevent wrong side injury should have been in place, as detailed in the nursing report of [Nurse Byrne]."

Nurse Byrne's report set forth the standard of care for surgical nurses. Byrne stated in her report that national standards for nursing care for surgical patients includes the prevention of injury from wrong site surgery, and she explained that nurses caring for surgical patients are supposed to follow "time out" procedures to conduct a final verification of the correct surgery site. She further stated that "[i]t is an essential standard of care that the periopoerative nurses ensure that a current . . . consent form and history [and] physical form are accurately completed with the laterality explicated and present on the patient's chart prior to the surgical procedure." Accordingly, both Dr. Gelbard and Nurse Byrne both set out a standard of care applicable to nurses assisting with surgical procedures.

With respect to a breach of the standard of care, Nurse Byrne stated that the breach of the standard of care obvious from the nurses' documentation was the absence of a perioperative verification process as well as essential documents missing from the medical record. But Nurse Byrne mentioned Nurse Goldston only once: she stated that a nurse's note in the perioperative record

noted that the intraoperative surgical procedure site re-verification by "time out" was completed by four nurses, including "BG."  Thus, "BG" was one of the nurses who performed the site re-verification procedures that Nurse Byrne stated were necessary under the standard of care.  And yet, Nurse Byrne noted, it was unclear from the surgery records whether the surgical site was marked or what process the staff had used in completing the time out procedures.

Nurse Byrne did not specifically mention Nurse Goldston anywhere else in her report, and Dr. Gelbard did not mention her specifically at all.  Thus, the only breach of the standard of care that was alleged against Nurse Goldston specifically was that she participated in the site re-verification procedure but that the records were not clear what procedure was actually followed.

Although both Nurse Byrne and Dr. Gelbard stated that it was the responsibility of operating room personnel to make sure the appropriate records were available and that from the records, it appeared that imaging studies that should have been available were not in the operating room during surgery, neither asserted that it was Nurse Goldston's responsibility to ensure that appropriate xray and imaging studies were available in the operating room or that she breached a standard of care by failing to do so.  Similarly, although both Dr. Gelbard and Nurse Byrne noted that no history and physical appeared in the medical records, Nurse Byrne did not assert that it was Nurse Goldston's responsibility to make sure that a completed patient history and physical were

performed upon a patient's admission or that she breached the standard of care by failing to make sure that a history was taken and a physical performed. Thus, although both Dr. Gelbard and Nurse Byrne indicated that there was a breach of the standard of care applicable to nurses, neither specifically implicated any conduct particular to Nurse Goldston, other than a failure to clarify what site re-verification procedures were used.

Most importantly, as for causation, Dr. Gelbard stated that certain procedures must be followed by all operating room personnel to ensure correct site surgery. He also stated that the failure to correctly place the stent and to recognize its misplacement caused Mr. Wright to suffer permanent loss of kidney function. But he did not connect those two statements; that is, he did not provide an explanation or opinion as to how the failure to follow site re-verification procedures, or any of the other claimed departures from the standard of care by the nurses, caused Dr. Vestal to misplace the stents or to fail to recognize the misplacement, which ultimately caused Mr. Wright to suffer the injuries alleged.[32] Accordingly, although Dr. Gelbard's report made

---

[32] *See Collini v. Pustejovsky*, 280 S.W.3d 456, 467 (Tex. App.—Fort Worth 2009, no pet.) (holding that expert report was inadequate because it failed to provide any medical detail as to how doctor's prescription of medication caused the harm alleged).

statements that point to causation with respect to Nurse Goldston, under the law, it was inadequate on that element.[33]

Nurse Byrne gave her opinion as to causation, but as a nurse, she is not qualified to opine on medical causation in an expert report provided under section 74.351.[34] Dr. Gelbard could have incorporated her report into his and adopted her opinion as his own,[35] but he did not do so; he only referenced her report once, when he stated that "the proper procedure to prevent wrong side injury should have been in place, as detailed in the nursing report of [Nurse Byrne]." Furthermore, even if he had incorporated or adopted her report, Nurse Byrne's report was also inadequate as to causation. Although she stated that the breaches she pointed out "led to an incorrect surgical site procedure," she did not explain *how* the failure to follow site re-verification procedures, or any of the other claimed departures from the standard of care by the nurses, caused Dr. Vestal to misplace the stents or fail to recognize the misplacement. Thus,

---

[33] *See id.*

[34] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (r)(5)(C), (r)(6) (defining "expert report" as a written report provided by an "expert" and defining "expert" with respect to causation as "a *physician* who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence") (emphasis added); *Benish v. Grottie*, 281 S.W.3d 184, 205 (Tex. App.—Fort Worth 2009, pet. denied).

[35] *See Kelly v. Rendon*, 255 S.W.3d 665, 676 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

the expert reports were deficient. Accordingly, we sustain this issue as to Nurse Goldston.

*USMD*

Finally, we consider USMD's argument that the trial court erred by denying its motion to dismiss. The Wrights claimed that USMD was negligent by and through its employees and agents, including Nurse Goldston. Specifically, they alleged that USMD's employees and agents provided assistance, including but not limited to improper preoperative preparation and completion of the site checklist upon which Dr. Vestal may have relied. They further alleged that USMD's employees and agents provided assistance during the procedure in which the stent was mistakenly placed in Mr. Wright's left kidney and, consequently, that USMD was negligent for the wrongful stent placement.

As it did in its motion to dismiss, USMD asserts on appeal that Nurse Byrne's report is conclusory as to a breach of the standard of care and that she was not qualified to give an opinion on causation. It further asserts that Dr. Gelbard's report fails to identify any causal link between a breach of the standard of care by it or Nurse Goldston and any injury to Mr. Wright.

USMD may be held vicariously liable for the acts of its employees.[36] Thus, if the Wrights provided an expert report that was adequate as to USMD's employees, then those reports are adequate for their vicarious liability claims against USMD.[37] We have held that the reports of Dr. Gelbard and Nurse Byrne were deficient as to Nurse Goldston. We now consider whether those reports were adequate as to any other USMD employee.

Both Dr. Gelbard and Nurse Byrne gave opinions on the standard of care applicable to nurses, and Dr. Gelbard went as far as expressing a standard of care for all operating room personnel. Both included as part of the standard of care a completion of a patient history and a physical examination, the results of which should be included in the hospital chart and available in the operating room. Both noted that these records were not included in Mr. Wright's chart. Dr. Gelbard further stated that operating room personnel should make sure that the appropriate imaging studies were available in the operating room and that

---

[36] *See Gardner*, 274 S.W.3d at 671–72; *RGV Healthcare Assocs., Inc. v. Estevis*, No. 13-08-00113-CV, 2009 WL 1886889, at *7 (Tex. App.—Corpus Christi July 2, 2009, no pet.) (stating that for claims of vicarious liability, an expert report is adequate as to a hospital defendant if that report adequately addresses the employee for whom plaintiff seeks to hold the hospital vicariously liable).

[37] *See Gardner*, 274 S.W.3d at 671–72; *see also Univ. of Tex. Sw. Med. Ctr. v. Dale*, 188 S.W.3d 877, 879 (Tex. App.—Dallas 2006, no pet) (concluding that plaintiffs need not mention defendant hospital in expert report when plaintiffs limited their claim against hospital to vicarious liability for employees).

this was not done.  Both noted that certain procedures should be followed by nurses caring for surgical patients, and Nurse Byrne stated that the hospital records did not indicate whether these procedures were correctly followed. Thus, both Dr. Gelbard and Nurse Byrne discussed the standard of care and how it was breached.[38]

As for causation, Dr. Gelbard did not detail or explain how the nurses' or other staff members' failure to ensure that the preoperative imaging studies were in the operating room caused Dr. Vestal to misplace the stent the first time and fail to identify the error or to misplace the stent a second time.[39]  He did state that having the preoperative imaging studies in the operating room would have helped to confirm the proper side and that flouroscopic monitoring during the procedure would have "in all likelihood" identified the error.  But he also stated that the November follow up appointment should have alerted Dr. Vestal to the error but that he failed to recognize it and that the December follow up appointment and ultrasound also should have alerted Dr. Vestal to the

---

[38] *See Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 867–68 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting that courts of appeals "have found adequate expert reports in cases where a plaintiff has sued a hospital only and referred to its nurses collectively in order to establish the hospital's vicarious liability"); *Kettle v. Baylor Med. Ctr. at Garland*, 232 S.W.3d 832, 841 (Tex. App.—Dallas 2007, pet. denied) (holding that expert report was adequate as to vicarious liability claims against hospital when report discussed collectively the breach of the standard of care by the hospital's nurses).

[39] *See Collini*, 280 S.W.3d at 467.

error but that he again failed to recognize it. Thus, in light of these statements, Dr. Gelbard needed to explain how having imaging studies and flouroscoping on the day of the surgery would have caused Dr. Vestal to recognize the error and that the failure to have those aides resulted in Dr. Vestal not recognizing the error until a time when permanent injury had been done. And Dr. Gelbard never specifically implicated the acts of any person other than Dr. Vestal as causing the improper stent placements or the failure to recognize the misplacements or alleged that some other act caused Mr. Wright's injuries. Accordingly, Dr. Gelbard's report was inadequate as to USMD.

The Wrights point to an affidavit of Dr. Gelbard that they filed in the trial court after the motions to dismiss were filed. Nurse Goldston and USMD argue that the trial court could not consider this affidavit and that it was inadequate to remedy the defects of the expert reports. In the affidavit, Dr. Gelbard said that

> in stating in my Expert Report that "it is my opinion that each of these acts . . . was a proximate cause . . . ," it was my intention to reference all the acts or omissions of negligence detailed in my Expert Report with regard to all the health care personnel involved in Mr. Wright's treatment. . . . That is to say, my opinion as to causation was not intended to merely be limited to the acts or omissions of Dr. Vestal and [UANT], but was instead intended to be in reference to all those health care professionals referenced in my Expert Report and referenced in Nurse Byrne's report.

Even if the trial court could have considered this affidavit as part of Dr. Gelbard's expert report, this affidavit does not help the Wrights. The affidavit

does not provide the information lacking in the first report:  how the claimed departures from the standard of care by the nurses or any other hospital personnel caused Dr. Vestal to misplace the stents or fail to recognize the misplacement.  Accordingly, we sustain USMD's sole issue.

**Conclusion**

Having overruled Dr. Vestal's sole issue, we affirm the trial court's order as to the Wrights' claims against him. Having overruled in part UANT's sole issue, we affirm the trial court's order denying UANT's motion to dismiss the Wrights' claims based on the actions of Dr. Vestal. Having sustained USMD and Nurse Goldston's sole issue and having sustained in part UANT's sole issue, we reverse the trial court's order on the Wrights' direct liability claims against UANT and the Wrights' claims against USMD and Nurse Goldston. We remand the case for the trial court's determination whether to grant the Wrights a thirty-day extension to cure the deficiencies in the expert reports as to those claims.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: August 31, 2009