LOUDIN, Appellant,

v.

RADIOLOGY & IMAGING SERVICES, INC., et al., Appellees.

[Cite as *Loudin v. Radiology & Imaging Servs.,
Inc.,* 185 Ohio App.3d 438, 2009-Ohio-6947].

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24783.

Decided Dec. 31, 2009.

Carr, J., concurred in judgment only.

Lawrence J. Scanlon and Michael J. Elliott, for appellant.

Douglas G. Leak and Stacy A. Ragon, for appellees.

DICKINSON, Presiding Judge.

## INTRODUCTION

{¶ 1} After Lonna Loudin found out that the lump she discovered in her breast had been visible on a mammogram that was taken 13 months before she was diagnosed with breast cancer, she sued the radiologist who had interpreted the mammogram, Richard Patterson, M.D., and his employer, Radiology and Imaging Services, Inc. Loudin alleged claims of negligent infliction of emotional distress, medical malpractice, respondeat superior, and negligent supervision. The trial court granted summary judgment to the defendants on Loudin's claim of negligent infliction of emotional distress because it determined that Dr. Patterson's alleged negligence was not the cause of Loudin's cancer. It granted summary judgment to them on her medical-malpractice claim because it determined that there was no genuine issue of material fact remaining regarding proximate cause under either the loss-of-chance or strict-causation theories. Based on its decision regarding the medical-malpractice claim, the trial court also granted Radiology and Imaging Services summary judgment on the remaining two claims. This court reverses and remands because there is a genuine issue of material fact regarding each element of Loudin's claims for medical malpractice and negligent infliction of emotional distress. As this court has reversed the decision of the trial court regarding the medical-malpractice claim, the trial court's decision regarding the negligent-supervision and respondeat-superior claims must also be reversed. Loudin has also appealed the trial court's exclusion of certain testimo-

ny from her expert radiologist. This court affirms the trial court's ruling on that issue.

## FACTS

{¶ 2} Loudin has been concerned about the early detection and treatment of cancer, at least since she saw her husband die of lung cancer in the early 1980s. In order to protect herself against breast cancer, she conducted self breast examinations and submitted to annual screening mammograms at Reflections Breast Health Center, which is owned and operated by Radiology and Imaging Services.

{¶ 3} In April 2003, Loudin had a screening mammogram completed, which Dr. Patterson interpreted as normal. The following spring, when she felt a lump high in the outer part of her left breast, Loudin consulted her gynecologist, who referred her for a diagnostic mammogram. On May 21, 2004, Loudin submitted to another mammogram through Radiology and Imaging Services. This time, the technician used a small metal marker to highlight the area of her breast where she reported feeling a lump. According to the radiology report, the 2004 films revealed "a 1.5 cm mass with a spiculated margin in the left breast" that appeared "highly suggestive of malignancy." Dr. Patterson admitted that in retrospect, the same mass appears on several earlier mammogram films, including those from 2003. Without conceding that he had violated the standard of care, Dr. Patterson agreed that Loudin had breast cancer in April 2003 when he interpreted her mammogram as normal.

{¶ 4} In early June 2004, Loudin underwent a biopsy and lumpectomy. In her affidavit, she said that her oncologist told her that he had removed a two-centimeter mass that was a well-differentiated, Stage I breast cancer, and she would not require radiation treatment. The subsequent pathology report of the tumor, however, indicated that the cancer was "[i]nvasive carcinoma extending to margin."

{¶ 5} In early July, Loudin underwent additional surgery to check for signs that the cancer had spread to her lymph nodes. Following the surgery, tests revealed that the cancer had spread to two lymph nodes, which negatively affected her diagnosis. Doctors informed Loudin that rather than Stage I, her disease was actually Stage IIA, based on the involvement of lymph nodes. Loudin's surgeon acknowledged that based on early findings, he initially believed her cancer was localized, but he testified by deposition that he does not engage in the staging of cancer. Loudin's oncologist denied having told her anything about her diagnosis until after the final pathology report was complete.

{¶ 6} Loudin first completed eight rounds of chemotherapy followed by radiation treatments five days a week for six weeks. After that, she began a hormonal drug therapy that is expected to last for five years. As of October 2005, when Loudin was deposed, she had not had any recurrence of cancer and no additional treatment was on the horizon, other than the continued hormonal drug therapy. There is no evidence in the record to indicate that Loudin's status has changed since that time.

{¶ 7} Loudin's expert radiologist, Jules Sumkin, D.O., explained in deposition that doctors generally advise women to have yearly mammograms after a certain age because screening has led to earlier detection of breast cancer, which has improved patient survival. He further explained that when interpreting mammograms, a doctor should compare the current films with past films to look for changes over time, especially asymmetric changes and masses with irregular or spiculated edges. Dr. Sumkin testified that Dr. Patterson deviated from the acceptable standard of care by failing to flag the mass in Loudin's left breast while interpreting her April 2003 mammogram. According to him, the standard of care required the radiologist to note the mass, suggest the possibility of malignancy, and request additional radiographs for further evaluation.

{¶ 8} Dr. Sumkin testified that in retrospect, Loudin's mass was visible as far back as the 1999 films. He further testified that it was not a deviation from the standard of care to fail to flag the mass before 2003, however, because it was "virtually invisible" on the earlier films. He also testified that although still "a challenging case" in 2003, by then, the finding was more pronounced and should have been caught. As he explained it, the 2003 films show a lighter area with "little radiating lines coming out of it." He said that the asymmetric area "looks like a nodule or mass, [with] * * * an irregular margin." This is "a potential problem" that required the doctor to compare the films with prior studies to assess the likelihood that the density might be malignant. He testified that the prior films, going back to 1999, indicate that a mass was present in the same area and was growing larger over time, eventually tripling in size between 1999 and 2004, when it was diagnosed. When asked whether the lesion he saw on the film was cancerous in April 2003, Dr. Sumkin answered that "it was a malignant appearing lesion and it was most likely cancer, which it turned out to be." Dr. Patterson testified that when he interpreted the 2003 films, he compared them to Loudin's 2002 and 1999 studies, but he did not notice anything suspicious.

{¶ 9} Dr. Patterson's colleague who interpreted Loudin's 2004 mammogram testified that the mass "was so clearly malignant" by that time that he did not need to order further tests. He said that there was so much spiculation, which he described as a starburst appearance to the mass, that he rated it a five on a scale of zero to five, with five being the most suspicious for malignancy.

{¶ 10} Based on Dr. Sumkin's reading of the mammograms, Loudin's expert oncologist, Ronald Citron, M.D., testified by deposition that Loudin's cancer grew from one centimeter in April 2003 to two centimeters by the time it was removed in 2004. In his opinion, to a reasonable degree of medical probability, had the cancer been caught in April 2003, the lymph nodes would not have been involved. He explained that it was the involvement of her lymph nodes that stepped up her cancer from Stage I to Stage IIA.

{¶ 11} Dr. Citron generally described the progressive nature of cancer. He explained that in addition to the spread of cancer beyond the site of the original tumor, the tumor burden will also increase with time. Dr. Citron described the tumor burden as the number of cancer cells in the body. He explained that while the tumor is untreated, it will continue to grow and add cells. "[C]ancer is a progressive disease * * * as time goes on, if the patient is not treated, there will be more cancer cells in the body, more to kill [when treatment begins]."

{¶ 12} Dr. Citron described four main factors that affect survivability and treatment decisions and expressed the opinion that for Loudin, two of the four factors had undergone adverse changes during the period between her 2003 and 2004 mammograms. That is, in Dr. Citron's opinion, Loudin's tumor had grown and the cancer had spread to her lymph nodes during the period of delay. The oncologist who is treating Loudin testified that he believes "that there's a 60 to 70 percent chance that she will never have the cancer come back and that she will be cured of this disease * * * [a]nd vice versa then would be a 30 to 40 percent chance that the disease will show up somewhere else and she will not survive." He said that at least as of the time that he was deposed, Loudin had no distant metastatic sites. Dr. Citron quoted more optimistic survivability rates. According to Dr. Citron, more recent medical literature indicates that given the advancements in cancer treatments, Loudin has an 82 percent chance that the cancer will not come back to kill her.

{¶ 13} Dr. Citron testified that he believed that as a result of the delay in diagnosis, Loudin's long-term prognosis had been downgraded from an 85 percent chance of survival to an 82 percent chance. He explained that once the primary tumor has been removed and patients are being treated with other therapies, such as chemotherapy and radiation, there is nothing for doctors to measure in order to determine whether the therapies are working. Doctors and patients must simply wait for time to pass in order to determine whether the patient is in the 54 percent of people who will respond to the treatment.

{¶ 14} Dr. Patterson and his employer presented expert testimony opposing most of the opinions expressed by Drs. Sumkin and Citron. According to their evidence, Dr. Patterson did not violate the standard of care and, if the cancer had been caught in 2003, it would not have changed Loudin's diagnosis, course of

treatment, or outcome. As this is an appeal from an entry of summary judgment against Loudin, however, this court must view the facts in the light most favorable to her.

## PROCEDURAL BACKGROUND

{¶ 15} After largely completing discovery, Loudin voluntarily dismissed her claims. Months after refiling the case, she obtained leave of court to amend her complaint, and Dr. Patterson and his employer responded by moving to dismiss the amended complaint for failure to state a claim upon which relief could be granted. The trial court issued a briefing schedule for a response to the motion and a reply. The parties each supported their arguments with evidence acceptable under Civ.R. 56(C), and the trial court converted the motion to one for summary judgment. Loudin has appealed the trial court's decision granting Dr. Patterson and his employer summary judgment on all claims.

{¶ 16} Loudin alleged medical malpractice "leading to the increase in the size of Plaintiff's tumor, metastasis to the lymph nodes and emotional distress, including fear of an increased risk of recurrence of cancer." She further alleged that as a direct and proximate result of the negligent diagnosis, she "has experienced and continues to experience pain, suffering, mental anguish and emotional distress as a result of the loss of chance of a better outcome, including fear of an increased risk of recurrence of cancer." In her affidavit, Loudin testified that "[she is] severely distressed by [the] delay in diagnosis, which [she] fear[s] has increased [her] risk for reoccurrence of cancer and possibly death and [she has] suffered additional physical injury, including, but not limited to, depression, fatigue, and physical illness and * * * [an inability] to adequately perform [her] job responsibilities * * *." Although Loudin did not plead a separate claim for relief for negligent infliction of emotional distress, the trial court noted that the parties had agreed that Loudin had asserted a separate cause of action for negligent infliction of emotional distress. The parties have not suggested to this court that Loudin's claim for negligent infliction of emotional distress was not properly before the trial court.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

{¶ 17} Loudin has argued that the trial court incorrectly granted summary judgment against her on her claim for negligent infliction of emotional distress because she provided evidence of a contemporaneous physical injury; that is, the increase in the size of her tumor and the cancer's metastasis to her lymph nodes. She testified that she suffered severe emotional distress as a result of the delay in diagnosis that subjected her to an increased risk of metastasis of cancer and even death. She has argued that the growth of the tumor and its spread to her

lymph nodes during the period of delay in diagnosis were contemporaneous physical injuries that put her case into a different light than those requiring severe and debilitating emotional distress. Dr. Patterson and his employer have argued that Ohio law does not permit a plaintiff to maintain a claim for negligent infliction of emotional distress for an alleged delay in diagnosis of cancer.

{¶ 18} Originally, Ohio law would not permit a claim of negligent infliction of emotional distress unless it was accompanied by a contemporaneous physical injury. In *Miller v. Baltimore & Ohio Southwestern RR. Co.* (1908), 78 Ohio St. 309, 85 N.E. 499, overruled by *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, the Ohio Supreme Court considered the claims of a woman who suffered property damage and great shock when she saw a train run off the tracks, through her fence, and into the side of her house. Id. at 315, 85 N.E. 499. The plaintiff claimed $500 worth of property damage and $3,000 in injuries due to the "severe nervous shock that shattered her nervous system and caused her great bodily pain and mental anguish and permanent injury to her person and health." Id. at 316, 85 N.E. 499. She did not allege that she suffered any physical injury in the incident.

{¶ 19} The Supreme Court noted that "the right to recover for [purely psychological] injuries * * * has been almost universally denied" and held, based on public policy and a lack of foreseeability, that the railroad was not liable for the plaintiff's psychological injuries, regardless of their subsequent physical manifestations. *Miller,* 78 Ohio St. at 316, 326, 85 N.E. 499, overruled by *Schultz,* 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109. The court held that "[n]o liability exists for acts of negligence causing mere fright or shock, unaccompanied by contemporaneous physical injury, even though subsequent illness results, where the negligent acts complained of are neither willful nor malicious." *Miller* at paragraph three of the syllabus.

{¶ 20} In *Miller,* the court discussed various concerns it had with allowing compensation for psychological claims in the absence of any physical injury. The court expressed concern that such cases "would naturally result in a flood of litigation" involving "easily feigned" injuries. *Miller,* 78 Ohio St. at 321, 85 N.E. 499, overruled by *Schultz,* 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109. The court believed that the difficulty juries had with deciding whether claimed physical injuries were real would be "greatly increased" with psychological claims and that "a wide field would be opened for fictitious or speculative claims." Id. In an effort to compensate psychological injury while requiring some form of corroboration, the court held that a contemporaneous physical injury was a prerequisite to assertion of a claim for negligent infliction of emotional distress. Id. at paragraph three of the syllabus.

{¶ 21} In 1983, the Ohio Supreme Court reconsidered its stance on purely psychological injuries. In *Schultz,* 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, the court considered whether to allow recovery for a driver who managed to avoid sustaining a physical injury on the highway after a large sheet of glass fell off the truck in front of him and smashed into his car, shattering the windshield. The driver alleged that he was permanently injured and required continued care for his psychological injuries. After a jury awarded him $50,000, this court reversed and remanded for a determination of whether the plaintiff had suffered a contemporaneous physical injury that would allow him to pursue a claim for negligent infliction of emotional distress. Id.

{¶ 22} The Ohio Supreme Court reversed, holding that "[a] cause of action may be stated for the negligent infliction of serious emotional distress without a contemporaneous physical injury." *Schultz,* 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, syllabus, overruling *Miller,* 78 Ohio St. 309, 85 N.E. 499, and its progeny. The court determined that the reasons it had given in *Miller* for demanding a physical injury as a prerequisite to such claims were no longer valid. Id. at 133, 4 OBR 376, 447 N.E.2d 109. It noted that although some states, like Ohio, had chosen to limit emotional-distress claims by requiring a contemporaneous physical injury while others had chosen to require a physical impact of some type, the justifications for the two doctrines are similar. Id. at 133, 4 OBR 376, 447 N.E.2d 109, fn. 2. Therefore, the court considered them together as compared to states that had no rule requiring a physical injury or impact as a prerequisite to a claim for negligent infliction of emotional distress. Id. at 133, 4 OBR 376, 447 N.E.2d 109. It determined that there was no indication that states that "do not require an impact as a basis for recovery" had experienced an excessive number of emotional-distress claims. Id., quoting *Falzone v. Busch* (1965), 45 N.J. 559, 214 A.2d 12, 16. It further determined that even if dropping the prerequisite could lead to a flood of litigation, that "is an unacceptable reason for denying justice." Id.

{¶ 23} The court further considered the fear of fictitious psychological injuries and fraudulent claims it had expressed in *Miller* and recognized that "[t]he danger of illusory claims for mental distress is no greater than in cases of physical injury, especially when the injury is slight." *Schultz,* 4 Ohio St.3d at 134, 4 OBR 376, 447 N.E.2d 109. It concluded that evidentiary requirements would provide a sufficient safeguard against fictitious claims. Id. Finally, it considered whether problems regarding the proof of emotional distress were insurmountable due to being based on speculation or conjecture and dismissed that concern because "[j]udges and juries will consider the credibility of witnesses and the genuineness of the proof as they do in other cases." Id. at 134–135, 4 OBR 376, 447 N.E.2d 109.

{¶ 24} The court noted that "[l]egal scholars who have considered the rule denying recovery in the absence of a contemporaneous physical injury or impact are unanimous in condemning it as unjust and contrary to experience." *Schultz,* 4 Ohio St.3d at 135, 4 OBR 376, 447 N.E.2d 109. It wrote that "[h]aving carefully examined the arguments in support of the contemporaneous physical injury rule, it is clear that continued adherence to the rule makes little sense" and overruled the earlier cases upholding the doctrine. Id. The court recognized that "those injured by the negligent infliction of serious emotional distress should have the opportunity to recover damages" even if they suffered no contemporaneous physical injury. Id. at 136, 4 OBR 376, 447 N.E.2d 109. Thus, the Ohio Supreme Court eliminated the contemporaneous-physical-injury rule and explained why physical-impact and physical-injury rules are unnecessary. Id. at 135, 4 OBR 376, 447 N.E.2d 109. In doing so, it did not adopt a rule requiring a subsequent physical manifestation of the emotional distress in order to validate the claim. See id. at 139, 4 OBR 376, 447 N.E.2d 109 (Holmes, J., dissenting).

{¶ 25} The court later, however, set a higher evidentiary bar for claims of emotional distress unaccompanied by physical injury. In *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, it "sought to limit liability by defining legal standards and evidentiary guidelines to ensure that the purported [emotional] injury has indeed been suffered." *Binns v. Fredendall* (1987), 32 Ohio St.3d 244, 245, 513 N.E.2d 278. In *Paugh,* the court permitted a mother's claim for negligent infliction of serious emotional distress caused by three motorists. *Paugh* at 74, 6 OBR 114, 451 N.E.2d 759. Within eight months, one of the motorists had wrecked her car onto the Paughs' property and the other two had wrecked into the Paughs' house. The mother claimed that witnessing the crashes in the area where her children often played caused her great psychological harm, despite the fact that her children had not been injured. She alleged no physical injuries to herself either, but sought recovery for spells of fainting and hyperventilation, medication, and a brief admission to a psychiatric ward. The court held that "[if] a bystander to an accident states a cause of action for negligent infliction of serious emotional distress, the emotional injuries sustained must be found to be both serious and reasonably foreseeable, in order to allow a recovery." Id. at paragraph three of the syllabus. According to the court in *Paugh,* "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id. at paragraph 3a of the syllabus. The court set forth factors to be considered in order to determine whether such an injury was reasonably foreseeable. Id. at paragraph 3b of the syllabus. But it rejected any requirement that a bystander who does not suffer a contemporaneous physical injury must prove a physical manifestation of the

emotional distress in order to support a claim of negligent infliction of emotional distress. Id. at paragraph two of the syllabus.

{¶ 26} In the 1987 case of *Binns v. Fredendall,* 32 Ohio St.3d 244, 513 N.E.2d 278, the Ohio Supreme Court held that if a plaintiff also suffers contemporaneous physical injury, she does not need to prove that her resulting psychological injuries are severe and debilitating. Id. at paragraph one of the syllabus. In *Binns,* the plaintiff and her live-in boyfriend were involved in a car crash. The plaintiff received minor physical injuries, but suffered serious psychological injuries as a result of remaining in the car after the crash with her boyfriend, who had received gruesome head injuries that caused his death. The Supreme Court determined that it is not necessary for a plaintiff who suffers at least minor physical injuries to present evidence that her psychological distress is severe and debilitating. Id. at 245, 513 N.E.2d 278. The court noted that "plaintiff's physical injuries take her outside the class of *Schultz* and *Paugh* plaintiffs who suffer purely emotional or psychiatric injury." Id. at 246, 513 N.E.2d 278. "As such, the emotional or psychiatric injuries which have arisen as a proximate result of the defendant's tortious act are compensable under the traditional rule for recovery." Id. "The tortfeasor takes his victim as he finds him, the effect of his tortious act upon the person being the measure of damages." Id. Thus, the plaintiff in *Binns* did not need to prove to a court, as a matter of law, that her emotional distress was more than mere upset or hurt feelings before proving to a jury that it reached the level of serious or debilitating. Id. at 245, 513 N.E.2d 278, fn. 1; see also *Heiner v. Moretuzzo* (1995), 73 Ohio St.3d 80, 84, 652 N.E.2d 664, quoting *Binns,* 32 Ohio St.3d at 245, 513 N.E.2d 278. *Heiner* explained that in *Binns,* the court held that "the test we announced in *Paugh v. Hanks* * * * for the recovery of damages for emotional and psychiatric injuries" does not apply to a person who has also suffered contemporaneous physical injury.

## CONTEMPORANEOUS PHYSICAL INJURY

{¶ 27} In this case, Dr. Patterson and his employer have argued that Loudin cannot maintain her claim for negligent infliction of emotional distress because she did not suffer a contemporaneous physical injury and has not offered proof of severe and debilitating psychological distress. Loudin has argued that her evidence of physical injury consists of expert testimony that her tumor doubled in size during the period of delay and the cancer was permitted to spread into her lymph nodes. She has cited the Indiana Supreme Court's case of *Alexander v. Scheid* (Ind.2000), 726 N.E.2d 272, 284, for the proposition that "the destruction of healthy lung tissue by a cancerous tumor" caused by a delayed diagnosis of lung cancer is a sufficient physical impact, under the modified impact rule, to satisfy the requirements for a claim of negligent infliction of emotional

distress. The Indiana Supreme Court explained that "the purpose of the rule is to confine recovery to those with 'direct involvement' in the defendant's negligent act or omission." Id., quoting *Shuamber v. Henderson* (Ind.1991), 579 N.E.2d 452, 456. Loudin has also cited the Colorado Supreme Court's decision in *Boryla v. Pash* (Colo.1998), 960 P.2d 123, 129, for the idea that "[i]n cases where the plaintiff demonstrates that her cancerous condition physically worsened as a result of the delayed diagnosis, [she] has demonstrated a sufficient physical injury to permit the recovery of emotional distress damages."

{¶ 28} Dr. Patterson and his employer have argued that the growth and metastasis of cancer are not contemporaneous physical injuries in this case. They have also argued that although some states have held that growth and/or metastasis of cancer is a physical impact, that does not equate to the physical injury required in Ohio. It is true that the term "physical injury," as used in Ohio, and the term "physical impact," as used in other states, have different meanings. This court is concerned only with the contemporaneous-physical-injury rule followed in Ohio.

{¶ 29} Ohio originally adopted the contemporaneous-physical-injury rule in *Miller* to exclude all claims for negligent infliction of emotional distress that were not pleaded in conjunction with a physical injury stemming from the same negligent conduct. *Miller v. Baltimore & Ohio Southwestern RR. Co.*, 78 Ohio St. 309, 85 N.E. 499, paragraph three of the syllabus, overruled by *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109. The rule was intended to offer some measure of protection against frivolous claims for emotional distress by requiring some more objective indicia of genuineness. Today in Ohio, however, a plaintiff may recover on a claim for a purely emotional injury unaccompanied by any physical impact or physical injury. *Schultz* at syllabus. In *Paugh*, the Ohio Supreme Court extended the law to cover a mere bystander to the peril, but it required that the emotional distress be "severe and debilitating" to a reasonable person. *Paugh v. Hanks*, 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph 3a of the syllabus. The court later held that a plaintiff may recover on a claim for negligent infliction of an emotional injury that does not meet the high evidentiary standard announced in *Paugh*, provided that the plaintiff was directly involved in the negligent incident. *Binns v. Fredendall*, 32 Ohio St.3d at 246, 513 N.E.2d 278 (allowing plaintiff's claim for emotional injuries under the "traditional rule for recovery," requiring the tortfeasor to take his victim as he finds him, due to plaintiff's minor physical injuries).

{¶ 30} Thus, after *Binns*, a plaintiff may bring a claim for negligent infliction of emotional distress without meeting the "severe and debilitating" *Paugh* standard, provided that the plaintiff also suffered a contemporaneous physical injury. The physical injury, no matter how minor, provides some

measure of proof that the plaintiff was actually exposed to the peril and was not a mere bystander. Black's Law Dictionary has equated "physical injury" with "bodily injury," which it has defined as "[p]hysical damage to a person's body." Black's Law Dictionary 801 (8th Ed.2004). Today, the contemporaneous-physical-injury rule requires a plaintiff to prove that the defendant's breach of duty caused her body physical damage as opposed to proving subsequent physical manifestations of emotional distress. If the plaintiff meets that requirement in a negligent-infliction-of-emotional-distress claim, she is not subject to the "severe and debilitating" emotional-distress standard announced in *Paugh*.

{¶ 31} According to expert testimony that must be viewed in a light most favorable to Loudin at this stage of the proceedings, reasonable minds could find that Dr. Patterson's deviation from the standard of care proximately caused Loudin to suffer a significant increase in the size of a malignant breast tumor and allowed the cancer to spread beyond the site of the original tumor and into her lymph nodes. Thus, each day that the cancer remained undiagnosed and untreated caused further damage to Loudin's body. Under the circumstances, the growth and metastasis of cancer are contemporaneous physical injuries that may support a claim for negligent infliction of emotional distress that is not severe and debilitating. *Binns v. Fredendall,* 32 Ohio St.3d at 245, 513 N.E.2d 278.

## IS FEAR OF CANCER COMPENSABLE IN OHIO?

{¶ 32} Loudin has claimed that Dr. Patterson's negligence subjected her to serious emotional distress due to fear that her cancer will recur and, perhaps, kill her. The parties disagree regarding whether a fear of metastatic cancer is a compensable injury in Ohio. Dr. Patterson and his employer have cited *Dobran v. Franciscan Med. Ctr.,* 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537, at ¶ 1, for the proposition that fear of metastasis of cancer cannot, under any circumstances, serve as the basis of a claim for negligent infliction of emotional distress.

{¶ 33} In *Dobran,* the plaintiff had a mole excised that turned out to be a malignant melanoma. *Dobran* at ¶ 2. After a sentinel lymph node biopsy, traditional testing revealed that his lymph nodes were negative for metastasis of cancer. Nevertheless, the plaintiff decided to send the remaining lymph node specimen to California for additional testing as part of a cutting-edge clinical study. Allegedly due to the defendant's negligence, the specimen thawed before reaching the California lab, precluding further testing. The plaintiff alleged that the special testing "would have defined the probability of metastasis and his life expectancy, and that his quality of life [was] negatively affected by the extreme emotional distress caused by the uncertainty surrounding a recurrence of cancer." Id. at ¶ 6. In barring the claim, the court relied on the fact that "Mr.

Dobran did not contract cancer as a result of [the defendant's] allegedly negligent actions [and] [i]n the event that his cancer ever returns, it will not be because [the defendant] placed him in any immediate risk of physical harm." Id. at ¶ 18.

{¶ 34} Considering the history of claims for negligent infliction of emotional distress in Ohio, the Supreme Court distinguished the facts of *Dobran* from negligent-exposure-to-illness cases like *Padney v. MetroHealth Med. Ctr.* (2001), 145 Ohio App.3d 759, 764 N.E.2d 492, and likened them to nonexistent-peril cases like *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 652 N.E.2d 664. In *Heiner*, the Supreme Court refused to allow a claim for negligent infliction of emotional distress because the plaintiff neither witnessed a harmful incident nor was she ever subjected to any actual physical danger. *Heiner* at 85, 652 N.E.2d 664. In *Heiner*, the plaintiff was incorrectly and repeatedly told by health-care professionals that she had tested positive for HIV. The court disallowed the claim because, despite the plaintiff's genuine and significant emotional distress, she had never been exposed to HIV and was HIV negative. *Dobran v. Franciscan Med. Ctr.*, 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537, at ¶ 12. Thus, the alleged negligence of the medical professionals, no matter how frightening, did not subject her, or anyone else, to any real physical peril. Id., citing *Heiner* at 85, 652 N.E.2d 664. The court concluded by noting that the facts of *Heiner* and *Dobran* "remind us that not every wrong is deserving of a legal remedy." Id. at ¶ 19, quoting *Heiner* at 88, 652 N.E.2d 664.

{¶ 35} *Dobran* is distinguishable from this case because in *Dobran*, there was no aggravation of cancer caused by a delay in diagnosis and treatment and Dobran suffered no physical injury caused by the alleged negligence. Dobran sought emotional-distress damages for "the uncertainty surrounding a recurrence of cancer," but the defendants had not increased his risk of recurrence or negatively affected his disease process in any way. *Dobran* at ¶ 6. As the Supreme Court pointed out, the defendants neither caused the cancer nor subjected Dobran to an increased risk of metastasis. Id. at ¶ 18. The defendants allegedly precluded the plaintiff from obtaining an extra modicum of security offered by experimental technology, but, unlike Loudin's situation, the defendants' actions in *Dobran* did not allow the cancer to grow or metastasize before treatment and did not in any way affect Dobran's chance to survive the illness.

{¶ 36} Dr. Patterson and his employer have also cited the Second District Court of Appeals decision in *McGarry v. Horlacher*, 149 Ohio App.3d 33, 2002-Ohio-3161, 775 N.E.2d 865, for the proposition that the trial court correctly rejected Loudin's effort to recover for emotional damages allegedly caused by a delay in the diagnosis of cancer. In *McGarry*, the plaintiff suffered a five-month delay while her doctor treated a suspected fibroid before he made a proper

diagnosis of the cancerous tumor in her uterus. By the time it was properly diagnosed, the cancer was in Stage III, which meant it had spread beyond the uterus and cervix. The Second District agreed with the trial court's conclusion that "a cause of action for negligent infliction of emotional distress did not lie * * * because McGarry's life had not been put in peril by an external force nor had she witnessed an accident or event putting the life of a close friend or loved one in peril * * *." Id. at ¶ 53. The Second District relied on the fact that the doctor had not caused the cancer and the alleged misdiagnosis was not an "external force" capable of serving as the basis of a claim for negligent infliction of emotional distress. Id. The trial court in this case relied on *McGarry* for its conclusion that Dr. Patterson and his employer were entitled to judgment as a matter of law on Loudin's claim for negligent infliction of emotional distress because Dr. Patterson's alleged negligence was not the external force that had caused the cancer.

{¶ 37} Negligent infliction of emotional distress, however, was not the focus of the *McGarry* decision. The court in *McGarry* devoted just one of the 82 paragraphs of its opinion to the analysis of the plaintiff's claim for negligent infliction of emotional distress. In that paragraph, the court cited only one case, *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 652 N.E.2d 664. *McGarry*, 149 Ohio App.3d 33, 2002-Ohio-3161, 775 N.E.2d 865, at ¶ 53. It cited *Heiner* for the proposition that the Ohio Supreme Court had recognized claims for negligent infliction of emotional distress only in situations in which the plaintiff's life had been "put in peril by an external force" or the plaintiff had "witnessed an accident or event putting the life of a close friend or loved one in peril." Id. But *Heiner* did not use the term "external force." Id.; see *Heiner*. The *McGarry* decision seems to imply that claims for negligent infliction of emotional distress should be reserved for cases of trauma, like automobile collisions. This court is not aware of any Ohio Supreme Court authority for that proposition. If the Ohio Supreme Court had intended to so limit claims for negligent infliction of emotional distress, it could have held in *Heiner* and *Dobran* that such claims cannot be maintained outside of automobile collisions or, at least, that they cannot be maintained in medical-malpractice cases.

{¶ 38} As discussed above, in both *Heiner* and *Dobran*, the Supreme Court focused on the fact that Ohio does not recognize a claim for negligent infliction of emotional distress based on a plaintiff's fear of a nonexistent peril. *Heiner*, 73 Ohio St.3d 80, 652 N.E.2d 664, syllabus; *Dobran*, 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537, at ¶ 13, 18. Such a claim requires an "actual threat of physical harm." *Heiner* at 82, 652 N.E.2d 664. The plaintiff in *Heiner* was not negligently exposed to HIV and distressed because she might have contracted it. She was simply given a false positive on an HIV test. In both

*Heiner* and *Dobran*, the doctor's alleged negligence did not in any way affect the plaintiff's disease process or put the plaintiff at risk of any actual physical peril. In *Heiner*, the Supreme Court reviewed other negligent-infliction-of-emotional-distress cases, noting that regardless of whether the plaintiffs were bystanders or were directly affected by the negligent conduct, each case dealt with a real or impending physical calamity. Id. at 85, 652 N.E.2d 664.

{¶ 39} Unlike the false positive testing in *Heiner* and the mishandling of the tissue sample in *Dobran*, neither of which subjected anyone to any real threat of physical harm, in this case, Loudin presented evidence that Dr. Patterson's alleged negligence subjected her to a 13-month delay in treating breast cancer. According to her expert oncologist, during the delay, the cancer doubled in size and metastasized to her lymph nodes, exposing her to an increased risk of recurrence and death. Loudin presented evidence that the enhanced risk of recurrence caused her to suffer serious emotional distress distinct from what she felt at her initial diagnosis of cancer.

{¶ 40} This court does not agree with the trial court's determination that because the defendants did not cause Loudin's cancer, there is no genuine issue of material fact regarding whether their alleged negligence proximately caused her any psychological injury. Loudin has not claimed that Dr. Patterson caused her cancer. She has essentially claimed that his negligence proximately caused an aggravation of her pre-existing condition. According to Loudin's evidence, but for Dr. Patterson's negligence, her cancer would not have doubled in size and spread to her lymph nodes, increasing her risk of recurrence and death. It is that increased risk, allegedly attributable to Dr. Patterson, that she claims has caused her serious emotional distress.

{¶ 41} The Ohio Supreme Court has said that "Ohio courts have limited recovery for negligent infliction of emotional distress to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person." *High v. Howard* (1992), 64 Ohio St.3d 82, 85–86, 592 N.E.2d 818, overruled on other grounds by *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052, citing *Paugh v. Hanks*, 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759; *Criswell v. Brentwood Hosp.* (1989), 49 Ohio App.3d 163, 551 N.E.2d 1315. In this case, Loudin has presented evidence tending to prove that the defendants' negligence exposed her to an enhanced risk of a recurrence of cancer. Based on the facts of this case, Loudin falls within the class of plaintiffs who can pursue a claim for negligent infliction of emotional distress because she is "in fear of physical consequences to [her] own person." Id. at 85–86, 592 N.E.2d 818.

{¶ 42} Viewing the evidence in the light most favorable to Loudin, a jury could reasonably find that but for Dr. Patterson's negligent reading of the 2003

mammogram, Loudin would not have had such a large tumor, the cancer would not have spread to her lymph nodes, and, therefore, she would not suffer from the emotional distress caused by her fear that she may be a victim of that increased risk of recurrence. Loudin has presented evidence creating a genuine issue of material fact regarding whether Dr. Patterson breached his duty to her and whether his breach caused her any harm. It is for a jury to determine the credibility of the testimony and, if it finds it credible, to assign a dollar amount to the injury.

{¶ 43} The trial court expressed some concern in this case that a jury would not be able to distinguish between the emotional distress Loudin experienced when she was first diagnosed with cancer and the increase in that distress that she claims is attributable to Dr. Patterson's negligence. The emotional distress Loudin originally experienced at being diagnosed with cancer is not compensable in this case, making the jury's task more difficult. Juries, however, are often asked to make difficult decisions on everything from which expert is more authoritative regarding a complicated scientific principle to what percentage of negligence is attributable to each party in a contributory-negligence case. There is no reason to believe a jury could not engage in the same complicated discussions to assign a value to Loudin's emotional distress. To the extent that it addressed the claim for negligent infliction of emotional distress, Loudin's first assignment of error is sustained.

## MEDICAL MALPRACTICE

{¶ 44} Loudin has argued that the trial court incorrectly granted Dr. Patterson's motion for summary judgment on her medical-malpractice claim. Specifically, she has argued that she presented evidence that created a genuine issue of material fact regarding whether Dr. Patterson deviated from the acceptable standard of care and whether that alleged deviation proximately caused her injuries, including the unchecked growth of the malignant tumor and the cancer's invasion into her lymph nodes during the delay. The trial court granted the motion for summary judgment on the medical-malpractice claim because "[Loudin] has failed to put forth evidence of any injury which was proximately caused by Defendants." The trial court agreed with Dr. Patterson's position that "growth and metastasis of cancer are not compensable physical injuries in Ohio."

{¶ 45} In order to establish a medical-malpractice claim in Ohio, a plaintiff must offer proof of four elements: (1) the existence of a duty owed to the plaintiff by the defendant, (2) a breach of the defendant's duty, (3) causation based on probability, and (4) damages. *Stinson v. England* (1994), 69 Ohio St.3d 451, 455, 633 N.E.2d 532. In this case, there was conflicting evidence regarding whether Dr. Patterson met the standard of care in reading Loudin's 2003

mammogram. Based on the evidence, reasonable minds could conclude that Dr. Patterson deviated from the standard of care and thereby caused a delay of 13 months in the diagnosis of Loudin's breast cancer.

{¶ 46} The focus of the disagreement on appeal is whether Loudin has presented evidence based on which reasonable minds could conclude that Dr. Patterson's alleged delay in diagnosis proximately caused her any harm. There was conflicting evidence regarding whether, if the cancer had been diagnosed at the time of the 2003 mammogram, it would have been a smaller, localized, Stage I cancer that would have been less likely to recur. Viewing the evidence in the light most favorable to Loudin, reasonable minds could conclude that had the cancer been diagnosed in 2003, it would not have doubled in size, metastasized to the lymph nodes, and increased to Stage IIA, decreasing Loudin's chance of survival.

{¶ 47} This court does not agree with the trial court's pronouncement that growth and metastasis of cancer are not compensable injuries in Ohio. The trial court did not offer any authority for that proposition. It merely concluded that "the growth and metastasis of the cancer did not cause Plaintiff any other physical injuries as evidenced by her current state of health."

{¶ 48} This court is not prepared to say that the growth and metastasis of cancer, if caused by a doctor's negligence, is a wrong that is simply not deserving of a legal remedy. See *Dobran v. Franciscan Med. Ctr.*, 102 Ohio St.3d 54, 2004-Ohio-1883, 806 N.E.2d 537, at ¶ 19, quoting *Heiner v. Moretuzzo*, 73 Ohio St.3d at 88, 652 N.E.2d 664. The growth and metastasis of cancer constitute physical harm that is a compensable physical injury if it is causally related to a breach of duty owed to the injured party. Viewing the evidence in the light most favorable to Loudin, reasonable minds could conclude that the 13–month delay in diagnosis was the proximate cause of the growth and metastasis of her breast cancer. If a jury determines that Dr. Patterson is liable for that injury, it can assign a dollar amount to the harm. To the extent that Loudin's first assignment of error addressed her medical-malpractice claim, it is sustained.

## OBJECTIONS TO EXPERT TESTIMONY

{¶ 49} Loudin's second assignment of error is that the trial court incorrectly sustained her opponents' objections to the testimony of her expert radiologist, Jules Sumkin, D.O. The trial court ruled that the videotaped deposition should be edited to exclude certain testimony on the basis that Loudin's lawyer had asked leading questions on redirect examination.

{¶ 50} Loudin has cited *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909, for the proposition that it is permissible to use leading

questions to direct a witness's attention to events or topics about which the witness has already testified. In this case, however, Loudin's lawyer didn't simply direct Dr. Sumkin's attention to a certain topic before asking nonleading substantive questions about that topic. Loudin's lawyer attempted to summarize Dr. Sumkin's earlier testimony and have him agree with the summary. Although a trial court has discretion to allow a lawyer to ask leading questions during direct examination in various situations, it also has discretion to prohibit it. Evid.R. 611(A) and (C); Staff Notes to Evid.R. 611(C). Loudin has cited various decisions of the Ohio Supreme Court for the proposition that "[a] trial court has latitude to exercise sound discretion in determining whether to allow leading questions on direct examination." See, e.g., *State v. Smith* (1997), 80 Ohio St.3d 89, 110–111, 684 N.E.2d 668. In this case, the trial court properly exercised its discretion to refuse to allow various leading questions during redirect examination. Loudin's second assignment of error is overruled.

## CONCLUSION

{¶ 51} Loudin's first assignment of error is sustained because there are genuine issues of material fact remaining for trial on both the claim for negligent infliction of emotional distress and the claim for medical malpractice. As this court has determined that the trial court incorrectly granted Dr. Patterson and his employer summary judgment on the medical-malpractice claim, the grant of summary judgment on the negligent-supervision and respondeat-superior claims are also reversed. This court affirms the trial court's decision regarding the objections to Dr. Sumkin's testimony. The judgment of the Summit County Common Pleas Court is affirmed in part and reversed in part, and the cause is remanded for proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BELFANCE, J., concurs.

CARR, J., concurs in judgment only.